AURA D. HARDISON et al., Respondents, v. HIRAM S. CORBETT, as Executor, etc., et al., Appellants.

Robert M. Clarke, Dixie Dunnigan and Knapp, Boyle & Thompson for Appellants.

Rogers & Rogers for Respondents.

WOOD (Parker), J. — Defendants appeal from a judgment quieting plaintiffs' title to 1168 shares of stock of the Union Oil Company. The complaint alleged that plaintiffs were the owners of said property, that defendants claimed ownership thereof but did not own the same or have any interest therein. The answer alleged that defendants were owners of the stock.

The facts were either admitted or established by uncontradicted evidence. Leonard W. Corbett died on May 24, 1940, leaving an estate of the value of approximately $200,000. The plaintiffs are daughter and son of a brother of Ida Hardison Corbett, the deceased wife of Leonard W. Corbett. The defendants are the executors of the will of Leonard W. Corbett.

By the decree of distribution in the estate of Ida Hardison Corbett, deceased, the plaintiffs were awarded interests of five-eighths and three-eighths, respectively, in 877 shares of Union Oil Company stock, subject to a life estate in Leonard W. Corbett. That life estate had been terminated and the ownership of said 877 shares is not involved herein, but this reference to those shares is made in order that there may be a proper understanding of statements concerning them which appear in certain letters hereinafter mentioned.

On August 25, 1938, Leonard W. Corbett signed his name in the presence of a witness on the back of each of the thirteen certificates (representing in the aggregate the

1168 shares of stock) at the place provided in the printed blank form on the back thereof for assignment and transfer of the shares of stock. On each of said certificates, in said printed blank form on the back thereof, at the place designated for the name of the assignee, the names of the plaintiffs appeared in typewriting. On each of said certificates the following appeared: "For Value received, I hereby sell, assign and transfer unto Aura D. and Harvey C. Hardison .............................................. Shares of the Capital Stock represented by the within Certificate, and do hereby irrevocably constitute and appoint ........................................... Attorney to transfer the said stock on the books of the within named Company with full power of substitution in the premises. Dated, Aug 25th 1938. Leonard. W. Corbett In Presence of Fred Brown."

After endorsing said certificates in such manner, Leonard W. Corbett put them in an envelope and wrote on the envelope in his handwriting "Aura D. and Harvey C. Hardison," and placed such envelope in his safe deposit box in a bank, where it with the enclosed certificates was found after his death.

Leonard W. Corbett was known to the plaintiffs as "Uncle Len." He wrote six letters in his handwriting to plaintiffs which, in the parts essential to the question involved herein, were as follows:

(1). "May 11th/38 My dear Aura—After getting entirely out of debt last fall—and I am sure happy to say so; I began picking up Union Oil shares, when I though__ the price was O K for you and Harvey after I go——

"I also looked into the matter of how to go about it, without paying big Lawyers fees, so I came to the conclusion that an endorsement of the back of the certificate was the best and leaving it in the Box in the Bank—— Today the number of shares is 1500—— The last I bought amounted to nearly $13,000. . . . .

"This was all done without consulting any one, and if it does not meet with your approval—just let me know. Hope you wont think I am getting ready to die—No I hope to be here for a few more years. . . . Uncle Len."

(2). "May 11/38 My dear Harvey . . . You know I don't write with a pen & ink much so one gets out of practice. All done now by stenographers, but don't like for her to

know all my personal affairs—— I wrote to Aura about this matter——

"Last fall I got out of debt entirely and I have quit speculating so with my surplus I began buying Union Oil for you and Aura after I go. . . .

"I put out nearly $13000 and added to what you folks have now—makes 1500 shares to start on & I hope to keep this up till I go.

"These certificates I bought recently will be endorsed to you & Aura & will be in my deposit box in the Bank of America—No one can use it but you folks——

"Now if this scheme does not meet with your approval let me know—— I want you to know that this was not taken up by no one as I consider it too personal to fool with expensive Lawyers and I feel they have proven troublesome & a darn nuisance on several occasions. . . . Uncle Len"

"May 27/38 This letter was sent to the wrong state hence it was returned to writer. I guess Ive lived so long in California—(52 yrs) that I have it on my mind—— Aura wrote me to know how the certificates of stock read—— I answered 877—Estate—⅝ hers & ⅜ yours $\frac{623}{1500}$ according to Court decree, but the I voluntary bought for you was 50/50 LWC"

(3). "May 23/38 My dear Aura—— I delayed answering your letter of May 16/38 till I could check up on the U stock—— number of shares and the number from the estate and the number Ive been buying for you & Harvey—— There is an old adage—'Words that are spoken may be forgotten, but things that are written become a record' which is very true; so I think if you will refer to the Decree you will find I am correct—— It is as follows——

877 shares from the Estate and
623 " Ive bought
———
1500 total

Those certificates from the Estate reads Leonard White Corbett with Life Interest in accordance with D/D in the Estate of Ida Hardison Corbett, Dec'd—— According to the decree (which you should have a copy) ⅝ go to you and ⅜ to go Harvey—— but the stock I have for you & Harvey and

which I hope to buy in the future will be ½ for you & ½ for Harvey—— You may have to pay a state inheritance on it unless the present law is changed——I am not sure about Taxes of any sort these days — They are awful and they are getting worse. . . .

"I do hope that your Uncle Fred will remember you and Harvey in his will . . . I have willed you & Harvey all of the S. P. [meaning Santa Paula] property, as you will have to look after the old Corbett Home which is already your— and an agent can take care of the rents if you & Harvey don't want to bother with it. . . . Uncle Len"

(4). On July 7, 1938, he wrote: "My dear Aura . . . At last I have the last certificate of Union Stock I scraped up enough money to buy at 18.00—— today it is 21¾ but while I could sell & make quite a nice profit, I did not buy it for that purpose—— I bought it for the Dividends while I am living & then it goes 50-50 for Aura & Harvey——Is that plain enough?

"This is a voluntary act on my part and I hope to buy some more when prices pick up, but at present—Lemon & Orange prices are very bad & acres & acres are being put out. . . . Uncle Len"

(5). "Aug 25/38 Dear Aura I think I have fixed the Union Oil Co stock I am leaving for you and Harvey the best and only way after looking into the matter from every angle——

"It was necessary to have each certificate witnessed, so I thought your Uncle Fred was nearer to you than any one, so I called him over the phone & told him I had a confidential matter to take up with him, and he said 'OK' come in——

"When I told him what it was and told him why I wanted him, but told him to think it over and if he declined I would get some other one of the family—— He was very nice about it and we signed them all and the next morning I put them in a big envelope & marked them Aura D. & Harvey C. Hardison and put them in a SD Box in the Bank. Altogether there is 204 shares.

"The Lemon & Orange business looks bad and I don't know what the future will be, but if it comes back, I may buy some more Union Oil Stock.

"Fixing this matter up this way does not mean that I

expect to die very soon, for while I am crippled up some what, I feel pretty good. . . . Uncle Len''

(6). ''Oct 1st/38 My dear Harvey Have been wanting to write you for some time, but have been too busy, and what I want to say will keep——

''In case Aura did not send you my letter or write you about it, I will proceed.

''After I sent you $500 apiece and after Aura wrote me thanking me, but sent it back, saying she did not need it, I commenced to buy Union Oil with what profit I could take from the business, and then the next question arose was, how to fix it to make sure you would get it with as little expense as possible, so after taking it up with the Union Secy and others, I came to the conclusion that the simple & safe way was to Endorse it over to Aura D. & Harvey C. Hardison, then the sure way was to have a witness.

''After looking over the relatives nearest to you to witness these certificates, I decided Fred was the man, as he related to you in two ways—I called him over the phone and told him I was coming in to see him.

''After I explained it to him, he said he would be glad to, so we fixed up the certificates and they are now in my Box in the Bank of America at Ventura. I hope to add to them when the citrus business picks up, it is nearly Red Ink for 38——

''There is in the box stock as follows——

| | |
|---|---|
| 877 | shares left by your dear Aunt Ida |
| 623 | " " " " " " " |
| 545 | " Bought in 37-38 by LWC—— |
| 2045 Total | I hold a life Int only |

''This is the longest letter I have written for a long time and I hope you can read & understand it——

''I might mention, that you folks get all of the S P real estate. . . . Uncle Len''

Mr. Corbett made a will on April 2, 1936, (about two years prior to writing the letters above mentioned concerning the Union Oil stock) in which he devised certain real property to respondents. The stock involved here was acquired after the will was made.

All of the dividends paid on the stock from the time of purchase to the time of the death of Mr. Corbett were re-

ceived by him and credited to him in his books of account. At the time of his death the certificates of stock were in Mr. Corbett's safe deposit box in the Bank of America at Ventura. A key to the box was in a safe at the home of Mr. Corbett and another key to the box was in his pocketbook, at the time of his death.

The above letters, the special endorsements of the certificates assigning them to plaintiffs, and the conduct of Mr. Corbett show clearly that it was his intention that the plaintiffs have the stock. Appellants concede that such was Mr. Corbett's intention. They assert, however, that more than an intention was required; that there must have been such positive intention and statement as to effect a present transfer of title; that Mr. Corbett did not constitute himself trustee for plaintiffs; that the transaction was an imperfect gift, and equity will not give effect to an imperfect gift by enforcing it as a trust, since to do so would be to give effect to an intention not contemplated by the maker of the alleged gift; and that the language of the letters did not constitute a present declaration of trust, but shows a contrary purpose.

In support of the assertion that Mr. Corbett did not consider that he had placed the certificates out of or beyond his power to retain them for himself, appellants rely on language in the letters as follows: that he bought the stock "for you and Harvey after I go"; that he bought the stock at 18 and the price increased to 21¾ "and while I could sell and make quite a nice profit I did not buy it for that purpose"; and "You may have to pay a state inheritance on it unless the present law is changed."

The statement that he bought the stock for plaintiffs "after I go" is consistent with an intention to retain a life estate in the stock and receive the dividends therefrom. The words that he "could sell and make quite a nice profit," standing alone, do indicate that he considered that it was within his power to sell the stock. When those words are considered, however, with the remainder of that sentence, "I did not buy it for that purpose," and when considered with the two sentences next following, "I bought it for dividends while I am living and then it goes 50-50 to Aura and Harvey. Is that plain enough?," the whole context is consistent with an intention to retain only a life estate, and is apt language to emphasize an intention not to sell the

stock but to hold it for plaintiffs. The statement relative to inheritance tax is consistent also with an intention to retain only a life estate.

Contrary to the assertion of appellants, and as a part of the evidence that Mr. Corbett did consider that he had transferred all of the title to the certificates, except a life estate, it is to be noted also that in one of the letters (Oct. 1st) he listed all of the stock and, immediately following the figures designating the total number of shares, he wrote in his handwriting, "I <u>hold a life Int</u> only," and underscored some of the words.

Further, and as a part of the evidence that Mr. Corbett did consider that he had placed the certificates beyond his power to retain them for himself, it is to be noted that in one of the letters (May 11, to Harvey), after stating the amount he had paid for the stock then on hand, he wrote in his handwriting, "These certificates I bought recently will be Endorsed to you & Aura & will be in my Deposit Box in the Bank of America—*No* one can use it but you folks," and he underscored the word "No." In one of the letters (Oct. 1st) he stated, "then the next question arose was, how to fix it to make sure you would get it with as little expense as possible, so after taking it up with the Union Secy and others, I came to the conclusion that the simple & safe way was to Endorse it over to Aura D. & Harvey C. Hardison, then the sure way was to have a witness." He did endorse the certificates specifically naming plaintiffs as assignees and did cause his said endorsements to be witnessed by a person who signed his name on the back of the certificates as such witness.

The situation here is not that which occurs frequently when property is left with a custodian upon oral directions to deliver the same at a certain time, or on some contingency, leaving uncertainty as to the intent and purpose of the donor. Mr. Corbett stated at length in his handwriting what his intention was, the estate he retained for himself, and the estate he created for plaintiffs.

 A valid trust in personal property may be created even by parol; such trust may be created as to the trustor and beneficiary by any words or acts of the trustor indicating with reasonable certainty: (1) an intention on the part of the trustor to create a trust; and (2) the subject, purpose and beneficiary of the trust. (Civ. Code, § 2221; *Noble* v.

*Learned,* (1908) 153 Cal. 245, 250 [94 P. 1047].) It is not necessary that the terms "trust" or "trustee" be used. (*Cahlan* v. *Bank of Lassen County,* (1909) 11 Cal. App. 533, 540 [105 P. 765].)

The case of *Cahlan* v. *Bank of Lassen County, supra,* is similar to the present case. Plaintiffs therein alleged ownership and possession of certificates representing bank stock; that the certificates were issued to one Scholl and assigned and delivered to plaintiffs; that Scholl died and the executors of his will claimed an interest in the shares of stock. The prayer of the complaint was that it be decreed that the executors had no interest in the stock. Judgment for plaintiffs was affirmed. Scholl had been for several years a partner of the father of the two plaintiffs. Scholl owned two certificates representing 20 shares of stock of the Bank of Lassen County. He left the certificates in a locked tin box which was in the bank vault. The certificates bore assignments in blank signed by Scholl which were witnessed by the cashier of the bank. The envelope, in which the certificates were enclosed, was endorsed in the handwriting of the bank cashier as follows: "In case of my death to go to Lena and Neva Cahlen." Plaintiffs' mother testified that Scholl told her he had given the girls each ten shares of stock and had put it in his box at the bank, and that he further said, "As long as I am kicking, I will hold this and receive the dividends." She testified further as to other parol statements made by Scholl concerning the stock. Scholl had stated to other persons that he had given the stock to plaintiffs. (After Scholl's death the executors delivered the certificates to plaintiffs, thinking it was their duty to do so.) The court said at page 538: "The evidence leaves no doubt of his intention to do this [referring to the giving of the stock to plaintiffs] and that he did everything to accomplish it except to deliver the certificates to the donees. And the evidence was sufficient to warrant the inference . . . that he retained possession for the donees and for the purpose only of collecting the dividends while he lived—in short, that he constituted himself their trustee for the purposes stated." The court said further at page 539: "The facts thus disclosed showed that Mr. Scholl held these certificates as trustee for plaintiffs. His only interest in the shares of stock was in the dividends paid during his lifetime." On page 540 it was stated further: "It was com-

petent for Scholl to become the trustee of the trust created by himself. . . . Any words which indicate with sufficient certainty an intention or purpose to create a trust will be effective in so doing, without the use of the words trust or trustee. . . . The circumstance that Mr. Scholl retained the power to receive the dividends on the stock did not affect the validity of the trust. . . . It does not appear that Scholl indorsed the certificates 'to the plaintiffs,' using that language. The indorsement was in blank. But the evidence clearly showed that his intention was to indorse them to plaintiffs and his act had that effect. Nor did it appear that he ever said in words that 'he held the same in trust for them,' but his declarations and acts showed beyond doubt that he did in fact so hold them and so intended.'' On page 541 it was stated further: ''It is true, as claimed by appellants, that an ineffectual attempt to make a gift does not create a trust, and equity will not perfect an imperfect gift by establishing a trust where none was contemplated (*Noble* v. *Learned,* 153 Cal. 245 [94 P. 1047]); but here the evidence is in every way consistent with the view taken by the trial court that a trust was contemplated, and its findings must stand. . . .''

█ The evidence in the present case was stronger in support of the trust than the evidence was in the *Cahlan case, supra.*

In the *Cahlan case* the statements relative to the trust were oral; the endorsements on the two certificates were in blank; the writing on the envelope containing the certificates was in the handwriting of the bank cashier; and the time for termination of the trust was ''upon my death,'' as written on the envelope.

In the present case the statements relative to the trust were in six letters in the handwriting of Mr. Corbett; the endorsements on the thirteen certificates specifically stated the names of plaintiffs as the assignees; the writing on the envelope containing the certificates was in the handwriting of Mr. Corbett; and the time for the termination of the trust was ''after I go,'' as written in some of his letters.

The case of *Randall* v. *Bank of America,* (1941) 48 Cal. App.2d 249 [119 P.2d 754], was an action to quiet title to an investment certificate which was issued in the names of ''George Ward or Thomas B. Randall under a trust agreement.'' One provision in the agreement was, ''And on his

death [referring to Ward], all unpaid principal and interest shall vest in Thomas B. Randall.'' Randall had no knowledge of the transaction. Ward retained possession of the certificate and after his death the defendant executor had possession of it. The executor contended there was no valid trust. The court in affirming the judgment quieting title said, at page 254, ''It is well to allude again to the question of vesting, in the light of Ward's declaration, that 'on his (Ward's) death all unpaid principal and interest shall vest in Thomas B. Randall.' It is not inconsistent with a present transfer of interest that the words 'shall vest' are used.''

In *Savelli* v. *Simon*, (1938) 25 Cal.App.2d 365 [77 P.2d 486], it was said at page 368: ''It is likewise settled that the intention of the alleged donor is a question of fact to be determined by the trial court from all of the evidence in the case . . . and that where different conclusions may be reasonably drawn from the evidence by different minds, the trial court's findings of fact will not be disturbed on appeal.''

█ Appellants contend that the complaint does not state facts sufficient to constitute a cause of action to establish a trust. Their argument is that the complaint is in the customary quiet title form alleging ownership in plaintiffs; that there was nothing therein to indicate the theory upon which plaintiffs were proceeding; that the general rule is that an action to quiet title is inconsistent with the establishment of an equitable interest and that in seeking the latter relief the facts relied upon should have been pleaded. In support of such contention appellants rely principally upon the case of *Bryan* v. *Tormey*, (1890) 84 Cal. 126 [24 P. 319]. That was an action to quiet title to real property. The complaint was in the usual quiet title form. The judgment was for plaintiff. In reversing the judgment it was held that ''the case proved and found is not the case made by the complaint,'' in that plaintiff was the owner of the equitable title and that defendant held the legal title in trust for plaintiff, and that the complaint should have been ''amended at the trial so as to conform to the proofs and to correspond with the findings.'' Other cases cited by appellants in support of such contention were likewise to establish equitable interests or trusts in real property which then stood in the names of persons other than the plaintiffs, rather than to establish ownership in the plaintiffs. In the present case the complaint alleged ownership in the plaintiffs, and the findings and judgment were that the plaintiffs were owners of the

stock and that defendants had no interest therein. In order to establish ownership, however, evidence was produced concerning the life estate of Mr. Corbett in the stock and the termination thereof. It was not necessary to make allegations relative to the chain of title through which plaintiffs derived ownership. In *Cahlan* v. *Bank of Lassen County, supra,* at page 539, it was said: "The point seems to be that as the complaint alleges ownership and possession of the bank stock and does not allege the trust to establish which the evidence was admitted, it was not competent to prove ownership by this means. . . . The primary object of the action is to establish ownership of these certificates of stock. . . . Proof of ownership made necessary a disclosure of all the facts out of which was to appear the ultimate fact of ownership. . . . In the case of *Booth* v. *Bank of Oakland,* 122 Cal. 19, [54 P. 370], a case quite similar to this, the trusteeship in the bank was shown to establish ownership. The court said: 'The ownership of the plaintiff is all that is material to be alleged.' . . ." (See *Randall* v. *Bank of America,* (1941) 48 Cal.App.2d 249 [119 P.2d 754].)

The evidence was sufficient to warrant the findings of the trial court that said certificates were endorsed and assigned by Leonard W. Corbett for transfer to plaintiffs with the intent and purpose of assigning and transferring to plaintiffs all of his interest and ownership in them, subject only to the right in himself to receive the dividends during his lifetime.

The judgment is affirmed.

Schauer, P. J., and Shinn, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied December 28, 1942.