[No. S012304. Aug. 9. 1990.]

Estate of MARGERY M. MacDONALD, Deceased.
JUDITH BOLTON, as Executirix, etc., Contestant and Appellant, v.
ROBERT F. MacDONALD, Claimant and Respondent.

## COUNSEL

Hersh & Hersh, Jill Hersh, Dan Bolton and Philip D. Humphreys for Contestant and Appellant.

McClintock & Quadros, Gordon E. McClintock, Brent A. Babow and William A. Reppy, Jr., for Claimant and Respondent.

## OPINION

**PANELLI, J.**—Civil Code section 5110.730, subdivision (a) (section 5110.730 (a)) provides: "A transmutation of real or personal property is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected."

In this case we are asked to decide what type of writing is necessary to satisfy the statute's requirements. In our view, section 5110.730 (a) must be construed to preclude reference to extrinsic evidence in the proof of transmutations. Accordingly, we conclude a writing is not an "express declaration" for the purposes of section 5110.730 (a) unless it contains language which expressly states that a change in the characterization or ownership of the property is being made. Thus, we affirm the judgment of the Court of Appeal.

### FACTS AND PROCEEDINGS BELOW

Decedent Margery M. MacDonald (Margery or decedent) married respondent Robert F. MacDonald (Robert) in 1973. Both had been married previously, and each had children by a previous spouse. Robert was president of R. F. MacDonald Company (the company), where he participated in a defined benefit pension plan.

In August 1984, Margery learned that she had terminal cancer, and she and Robert made plans to divide their property into separate estates.

Wishing to leave her property to her own four children, Margery divided the couple's jointly held stock, sold her half, and placed the proceeds in her separate account. The MacDonalds thereafter consulted with their personal accountant and attorney regarding the division of their jointly held real property. These properties were appraised and divided; Robert paid Margery $33,000 to equalize the division.

Robert was covered by a company defined benefit pension plan which came into existence on January 1, 1977. The designated beneficiary of Robert's interest in the pension plan was a revocable living trust he had established in 1982. The terms of the trust left the bulk of the corpus to Robert's children. In November, 1984 Robert turned 65 and his defined pension plan was terminated. On March 21, 1985, Robert received a disbursement of $266,557.90 from the plan. It is undisputed that Margery possessed a community property interest in the plan's benefits.[1] The pension funds were not divided or otherwise accounted for at the time of the couple's previous division of their jointly held assets. These community funds were deposited into IRA accounts at three separate financial institutions.

The IRA accounts were opened solely in Robert's name, the designated beneficiary of each being the revocable living trust which had been designated as beneficiary of the pension plan. The three form documents prepared by the financial institutions for signature by IRA account holders, each entitled "Adoption Agreement and Designation of Beneficiary" (adoption agreements), provided space for the signature of a spouse not designated as the sole primary beneficiary to indicate consent to the designation.[2] Robert signed the adoption agreements, indicating his agreement to the terms of the IRA account agreements and designating his trust as beneficiary; Margery signed the consent portions of the adoption agreements (consent paragraphs).

Margery died on June 17, 1985, bequeathing the residue of her estate to her four children. Executrix Judith Bolton filed a petition to determine title

---

[1] The dissent erroneously states (*post*, at p. 281) that the pension funds " . . . were essentially the product of Robert's 35 years in business, most of which preceded his marriage to decedent . . . ." Actually, as noted above, the pension fund did not even come into existence until 1977, more than three years *after* Robert married decedent. Thus all payments into the plan occurred during the marriage of the parties.

[2] The adoption agreements are one page long. They provide space for the entry of "General Information" (where Robert entered his name, address, and other personal data), for "Designation of Beneficiary," for "Consent of Spouse," for "General Provisions" (relating to payout procedures upon the participant's death) and for "Adoption of Plan" (which Robert signed, agreeing to participate in the particular financial institutions' retirement account plans). The consent portions of the adoption agreements each provided in full: "If participant's spouse is not designated as the sole primary beneficiary, spouse must sign consent. Consent of Spouse: Being the participant's spouse, I hereby consent to the above designation."

to personal property (Prob. Code, § 851.5), seeking to establish decedent's community property interest in the funds held in the IRA accounts. The trial court found that, in signing the consent paragraphs of the adoption agreements, decedent intended to waive any community property interest in the pension funds and to transmute her community property share of those funds into Robert's separate property. The court denied Bolton's petition, ruling that decedent had either waived her community property interest in the pension funds or, alternatively, transmuted it to Robert's separate property.

The Court of Appeal reversed, holding that the adoption agreements did not satisfy section 5110.730 (a). (The court also declined to apply the "terminable interest rule" to the pension funds. Robert's petition for review does not challenge the Court of Appeal's opinion in this regard.) A dissenting justice argued that because decedent, in signing the consent paragraphs, had taken "specific, clear and final [action to] accomplish both [a] transfer and a subsequent transmutation[, t]he language and purpose of the statutory requirement were fully satisfied."

We granted review to construe section 5110.73 x(a).

## DISCUSSION

It is undisputed that Margery possessed a community property interest in Robert's pension funds at the time they were disbursed to him. However, in California, married persons may by agreement or transfer, with or without consideration, transmute community property to separate property of either spouse.[3]

In this case, the trial court made a *factual finding* that "[d]ecedent, in executing the Adoption Agreement[s] for the three IRA's, intended to waive any community right she had in those IRA's and in fact to transmute her share of that community property asset to the separate property of Respondent." ■ However, we defer to a trial court's factual findings only when they are supported by substantial evidence. (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].)

---

[3] Civil Code section 5110.710 provides: "Subject to Sections 5110.720 to 5110.740, inclusive, married persons may by agreement or transfer, with or without consideration, do any of the following: [¶](a) Transmute community property to separate property of either spouse. [¶](b) Transmute separate property of either spouse to community property. [¶](c) Transmute separate property of one spouse to separate property of the other spouse."

Our close review of the record reveals that no substantial evidence supported the finding that Margery intended a transmutation.[4] The Court of Appeal incorrectly stated that Robert presented his own testimony and that of decedent's accountant as to decedent's state of mind when she signed the adoption agreements. In fact, there is absolutely no record evidence relating to Margery's intentions or state of mind when she signed the adoption agreements. The only testimony presented as to her state of mind during her estate planning activities relates to when she and her husband arranged an equal division of their jointly held real properties. The couple's accountant testified that she did not assist them in the division of any other assets.

■ Even if the trial court's findings as to Margery's intent were supported by substantial evidence, however, they would not support a finding of transmutation in this case. The statute providing for transmutation by transfer is by its own terms "[s]ubject to Sections 5110.720 to 5110.740, inclusive" (Civ. Code, § 5110.710), including, obviously, section 5110.730 (a). Section 5110.730 (a) invalidates attempts to transmute real or personal property unless certain conditions are met. We must therefore determine whether Margery's actions, whether or not they were *intended* to transfer her interest in the pension funds, were effective under section 5110.730 (a) to transmute those funds from community property to Robert's separate property. We are of the opinion that they were not.[5]

Section 5110.730 (a) requires that a valid transmutation be made, not just in writing, but in "writing by an *express declaration* that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected." (§ 5110.730 (a), italics added.) There is no dispute that

---

[4] No substantial evidence supports several other "factual findings" which the trial court incorporated into its judgment. The record contains no substantial evidence that Margery was "aware of the financial decisions being made in [her husband's] business, particularly in terms of the pension plan itself." The plan was stipulated to have been established in 1977, before Margery became active in her husband's business. (She was bookkeeper in the years 1978-1980.) The record does not support the conclusion she was aware of its terms; at best she knew of its existence. Nor is there any evidence that she was "aware of the terms of the Living Trust [established by Robert MacDonald and made by him the beneficiary of his pension plan when the plan was established, and later named by him beneficiary of the IRA accounts]." The living trust was established in 1982, when Margery was no longer bookkeeper for R. F. MacDonald Company. In short, the record discloses no evidence that Margery even knew she had a community property interest in the pension plan proceeds.

[5] We decline to treat respondent's IRA accounts as decedent's will substitute, as urged by respondent. Respondent has argued that Civil Code section 5110.730 does not apply to testamentary dispositions and/or to dispositions made by will substitutes. He further alleges that the IRA consent forms signed by Margery were a will substitute. We disagree. The record contains no substantial evidence that Margery or Robert intended that the IRA accounts would be so regarded. Moreover, consideration of respondent's will-substitute theory, advanced for the first time in this court, would be contrary to our established policy. (See Cal. Rules of Court, rule 29(b).)

the consent paragraphs in the adoption agreements, and decedent's signatures thereon, are "made in writing." These writings are manifestly "made, joined in, consented to or accepted by the spouse whose interest in the property is adversely affected," viz., decedent. Thus, the sole remaining issue to be decided is whether they constitute "an express declaration" for the purposes of section 5110.730 (a).

■ It is a fundamental rule of statutory construction that a court "should ascertain the intent of the Legislature so as to effectuate the purpose of the law." (*Select Base Materials, Inc.* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672].) In determining such intent "[t]he court turns first to the words themselves for the answer." (*People* v. *Knowles* (1950) 35 Cal.2d 175, 182 [217 P.2d 1].)

■ It is not immediately evident from a reading of section 5110.730 (a) what is meant by the phrase "an express declaration." Examination of the words of the statute and their arrangement reveals only that the "express declaration" called for is to be one "by" which "[a] transmutation of real or personal property" is "made." The statute does not state what words such an "express declaration" must include, what information it must convey, or even what topics it should discuss.

Since the words of section 5110.730 (a) themselves, including the phrase "an express declaration," are unclear and ambiguous, it is necessary to resort to other indicia of the intent of the Legislature to determine what meaning the statute should be given. (*Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299]; *In re Lance W.* (1985) 37 Cal.3d 873, 886 [210 Cal.Rptr. 631, 694 P.2d 744].) In doing so, we consider the historical circumstances of the statute's enactment, as well as its legislative history. (*California Mfrs. Assn.* v. *Public Utilities Com.* (1979) 24 Cal.3d 836, 844 [157 Cal.Rptr. 676, 598 P.2d 836].)

Section 5110.730 (a) was adopted in 1984. (Stats. 1984, ch. 1733, § 3, p. 6302.) Both parties refer to a 1983 report of the California Law Revision Commission (Commission) to ascertain the intent of the Legislature in enacting section 5110.730 (a). In recommending that the Legislature enact that statute, the Commission described "[s]ection 5110.730 [as] impos[ing] formalities on interspousal transmutations for the purpose of increasing certainty in the determination whether a transmutation has in fact occurred." (Recommendation Relating to Marital Property Presumptions and Transmutations, 17 Cal. Law Revision Com. Rep. (1984) (Commission report) pp. 224-225.) The Commission report goes on to state that section 5110.730 overrules existing case law that permitted oral transmutation of personal property. (Commission report, *supra*, at pp. 224-225.)

In its discussion of the law then governing transmutations (Commission report, *supra*, at pp. 213-215), the Commission observed that "[u]nder California law it is quite easy for spouses to transmute both real and personal property; a transmutation can be found based on oral statements or implications from the conduct of the spouses." (*Id.*, at p. 213.)

The Commission further observed that "the rule of easy transmutation has also generated extensive litigation in dissolution proceedings. It encourages a spouse, after the marriage has ended, to transform a passing comment into an 'agreement' or even to commit perjury by manufacturing an oral or implied transmutation." (Commission report, *supra*, at p. 214.) The Commission concluded its discussion of transmutation law by saying that "California law should continue to recognize informal transmutations for certain personal property gifts between the spouses, but should require a writing for a transmutation of real property or other personal property." (*Ibid.*) Unfortunately, the Commission did not explicitly expand upon the question of what such a writing should be required to contain, except to warn that "[t]he requirement of a writing should not be satisfied by a statement in a married person's will of the community character of the property, until the person's death." (*Ibid.*) The Commission stated only that its recommendations would be effectuated by the enactment of certain measures, including section 5110.730 (a). (Commission report, *supra*, at p. 217.)

It thus appears from an examination of the Commission report that section 5110.730 (a) was intended to remedy problems which arose when courts found transmutations on the basis of evidence the Legislature considered unreliable. To remedy these problems the Legislature decided that proof of transmutation should henceforth be in writing, and therefore enacted the writing requirement of section 5110.730 (a).

There is no question that the Legislature intended, by enacting section 5110.730 (a), to invalidate all solely oral transmutations. (Commission report, *supra*, at pp. 224-225.) By definition, *any* writing requirement would accomplish this limited goal. It is equally clear, however, that the Legislature intended that section 5110.730 (a) would invalidate some transmutations which, under then-prevailing case law, would have been upheld on the basis of evidence other than oral statements. (Commission report, *supra,* at p. 214 [" . . . easy transmutation . . . encourages a spouse . . . to commit perjury by manufacturing an oral *or* implied transmutation . . . ." (Italics added.)].)

In our view, the Legislature cannot have intended that *any* signed writing whatsoever by the adversely affected spouse would suffice to meet the requirements of section 5110.730 (a). First, to so construe that statute would render mere surplusage all the language following the words "unless made

in writing," including the phrase "an express declaration." A construction rendering some words surplusage is to be avoided. (*People* v. *Black* (1982) 32 Cal.3d 1, 5 [184 Cal.Rptr. 454, 648 P.2d 104]; *Watkins* v. *Real Estate Commissioner* (1960) 182 Cal.App.2d 397, 400 [6 Cal.Rptr. 191].) Second, as respondent acknowledges, some of the "easy transmutation" cases which section 5110.730 was intended to overturn involved nonoral conduct or signed writings.[6] Therefore, it seems reasonable to assume that the Legislature intended section 5110.730 (a) to invalidate some claimed transmutations even though some form of writing existed.

Thus, to construe section 5110.730 (a) so that it does not contain mere surplusage, as well as to effect legislative intent, we must fashion a test by which courts may judge the adequacy of particular writings for section 5110.730 (a) purposes.[7]

[6] For a detailed analysis of existing transmutation law, the Commission referred the Legislature to Reppy, *Debt Collection from Married Californians: Problems Caused by Transmutations, Single-Spouse Management, and Invalid Marriage* (1981) 18 San Diego L.Rev. 143 (Reppy article). (Commission report, *supra*, at p. 213, fn. 20.) Examples of objectionable transmutation cases discussed in the Reppy article include *Nevins* v. *Nevins* (1954) 129 Cal.App.2d 150 [276 P.2d 655]. There, a husband filed his separate federal income tax return (which at that time called for him to report half the community income) without including half of his wife's income. Since he was aware of the existence of his wife's income, the court found that the husband's signed tax return, which did not include it, was highly probative of the husband having transmuted his community property interest in his wife's income to his wife's separate property. Another example discussed in the Reppy article is *In re Marriage of Lucas* (1980) 27 Cal.3d 808 [166 Cal.Rptr. 853, 614 P.2d 285]. There, a motor home purchased by a couple during marriage was declared to have been transmuted to the wife's separate property when a purchase contract was made out in the husband's name only, but title and registration were made out in the wife's name only. (27 Cal.3d at pp. 817-818; Reppy article, *supra*, at pp. 156-157, fns. 48-53.) See also *Pacific Mut. Life Ins. Co.* v. *Cleverdon* (1940) 16 Cal.2d 788, 791 [108 P.2d 405] [transmutation of wife's community earnings when husband "borrowed" and repaid some of them] and *O'Connor* v. *Traveler's Ins. Co.* (1959) 169 Cal.App.2d 763 [337 P.2d 893] [transmutation of wife's community earnings when husband made no objection to her giving some of them to her son], both discussed in the Reppy article.

[7] The only reported California decision to consider the adequacy of a signed writing to meet the requirements of section 5110.730 (a) concluded that the writing in question was not sufficient. (*Estate of Blair* (1988) 199 Cal.App.3d 161, 167-168 [244 Cal.Rptr. 627].) In *Blair*, a surviving husband disputed a probate order that he pay his deceased wife's estate one-half of the net proceeds from the sale of the family residence, which had been purchased by the couple during their marriage and held in joint tenancy. The probate court had found that there had been a transmutation of the property from joint tenancy to community property "as a result of an agreement or understanding" between the spouses during the course of their subsequent separation. The agreement was said to consist in the wife having listed the residence as community property in her petition for legal separation and the husband having signed a deposition in the dissolution proceeding which said that he "believed" the residence was community property. The Court of Appeal held that the husband's deposition was not sufficient to satisfy Civil Code section 5110.730 because, although in writing, it did "not necessarily show the parties' separate agreement that the jointly held property was actually community property." (*Estate of Blair, supra,* 199 Cal.App.3d at pp. 165-168.)

We have previously construed a statutory writing requirement similar to section 5110.730 (a). In doing so we elucidated a principle of construction which is of fundamental importance for this case. In *California Trust Co.* v. *Bennett* (1949) 33 Cal.2d 694 [204 P.2d 324] *(Bennett)*, we concluded that a rental agreement respecting a bank safe-deposit box, printed on a card and signed by a husband and wife, which by its terms related only to rights of possession and access, did not satisfy a writing requirement for the creation of joint tenancies found in Civil Code section 683 (section 683).

Section 683 defines a joint tenancy and states the methods by which a joint tenancy may be created. Pursuant to section 683, a joint tenancy may be created by certain transfers, including one "from a husband and wife, when holding title as community property or otherwise to themselves and others or to one of them and to another or others, *when expressly declared in the transfer to be a joint tenancy . . . .* A joint tenancy in personal property may be created by a written transfer, instrument or agreement." (Civ. Code, § 683, subd. (a), italics added.) We held in *Bennett* that section 683 is mandatory, and that under it joint tenancies can be created only by a writing. *(Bennett, supra,* 33 Cal.2d at p. 697.)

More importantly, the defendant in *Bennett* contended that evidence of the decedent's declarations and the circumstances surrounding the renting of the safe-deposit box should be admitted to interpret the rental card, and that, when interpreted with this extrinsic evidence, the card was sufficient to satisfy the statutory requirement of a writing. *(Bennett, supra,* 33 Cal.2d at p. 699.)

We found that the rental agreement card in *Bennett* was "clear" and did "not purport to affect the title to the contents of the box," because it used neither the words "title" nor "ownership," but expressly referred only to rights of possession and access. We further observed that "it is well settled that where a statute requires the formality of a writing for the creation of an interest in property, it must contain words indicating an intent to transfer such interest, and in the absence of words which could be interpreted to show such intent, no parol evidence will be admitted." *(Bennett, supra,* 33 Cal.2d at p. 699.) Accordingly, we refused to allow parol evidence to supplement the words of the written agreement on the card so as to satisfy the writing requirement of section 683. (33 Cal.2d at pp. 698-699.)

Thus, just as section 5110.730 (a) requires an "express declaration" for a valid transmutation, section 683 requires that the creation of a joint tenancy be "expressly declared." Unlike section 5110.730 (a), however, section 683 explains what the express declaration it calls for must include. Specifically, section 683 requires that an express declaration creating a joint tenancy

must, "in the transfer," declare the interest being transferred "to be a joint tenancy." (Civ. Code, § 683, subd. (a).) Section 683 thus ensures that a court need not look beyond the face of a proffered writing to determine whether its writer intended to create a joint tenancy. (*Bennett, supra,* 33 Cal.2d at p. 699.)

Following the approach elucidated in *Bennett,* we conclude that a writing signed by the adversely affected spouse is not an "express declaration" for the purposes of section 5110.730 (a) *unless* it contains language which expressly states that the characterization or ownership of the property is being changed.

Our conclusion honors each of the principles of statutory construction we have discussed. First, it interprets "express declaration," so as to give significance to all the words of section 5110.730 (a). Second, it effects the intent of the Legislature to create a writing requirement which enables courts to validate transmutations without resort to extrinsic evidence and, thus, without encouraging perjury and the proliferation of litigation. Third, it is consistent with our interpretation of the similar requirement in section 683.[8]

■ We must now consider whether the writing involved in this case satisfies section 5110.730 (a). Decedent signed paragraphs consenting to the designation of a beneficiary on three standard bank-form adoption agreements. These paragraphs read in full: "If participant's spouse is not designated as the sole primary beneficiary, spouse must sign consent. Consent of spouse: Being the participant's spouse, I hereby consent to the above designation. [Signature.]"

Obviously, the consent paragraphs contain no language which characterizes the property assertedly being transmuted, viz., the pension funds which had been deposited in the account. It is not possible to tell from the face of the consent paragraphs, or even from the face of the adoption agreements as a whole, whether decedent was aware that the legal effect of her signature might be to alter the character or ownership of her interest in the pension

---

[8] Following the filing of his petition for review, Robert submitted a letter to court asking to amend his petition for review to include the issue of whether the adoption agreements constituted a valid written consent to the disposal of a community property asset under Civil Code section 5125, subdivision (b). Apparently, respondent's request amounted to a reformulation of his alternative argument in the Court of Appeal that decedent "waived" her interest in the IRA funds. The Court of Appeal found this argument to be "merely another means of circumventing the requirements of section 5110.730 . . . allowing transmutations by oral agreement or conduct." We agree with the view of the Court of Appeal and, for the same reasons, reject Robert's waiver contention. In any event, Robert's letter seeking to amend his petition was never filed or approved by the court and, accordingly, our grant of review was limited to the issue of construing section 5110.730 (a).

funds. There is certainly no language in the consent paragraphs, or the adoption agreements as a whole, expressly stating that decedent was effecting a change in the character or ownership of her interest. Thus, we agree with the Court of Appeal that these writings fail to satisfy the "express declaration" requirement of section 5110.730 (a).

■■■ We do not hold that section 5110.730 (a) requires use of the term "transmutation" or any other particular locution. Although a writing sufficient to satisfy the "express declaration" requirement of section 5110.730 (a) might very well contain the words "transmutation," "community property," or "separate property," it need not. For example, the paragraph signed by decedent here would have been sufficient if it had included an additional sentence reading: "I give to the account holder any interest I have in the funds deposited in this account."[9]

We are aware that section 5110.730 (a), construed as we have construed it today, may preclude the finding of a transmutation in some cases, where some extrinsic evidence of an intent to transmute exists. But, as previously discussed, it is just such reliance on extrinsic evidence for the proof of transmutations which the Legislature intended to eliminate in enacting the writing requirement of section 5110.730 (a).

Manifestly, there are policy considerations weighing both in favor of and against any type of transmutation proof requirement. On the one hand, honoring the intentions of the parties involved in a purported transmutation may suggest that weight should be given to *any* indication of these intentions. On the other hand, the desirability of assuring that a spouse's community property entitlements are not improperly undermined, as well as concern for judicial economy and efficiency, support somewhat more restrictive proof requirements. The Legislature, in enacting section 5110.730 (a), apparently thought it unwise to rely on some kinds of evidence to effect transmutations. It is not for us to question that legislative conclusion. Accordingly, the judgment of the Court of Appeal is affirmed.

Lucas, C. J., Broussard, J., Eagleson, J., and Kennard, J., concurred.

MOSK, J.—I concur in the judgment. I agree with the majority's ultimate conclusion that the purported "transmutations" in this case are not valid. But I do not agree with their construction of the controlling statute.

---

[9] Married persons who decide to open IRA accounts with community funds, of course, may or may not, in individual cases, wish to transmute those funds. Thus we do not assume that drafters of IRA account adoption agreements will want to revise their standard forms so that a spouse's signature consenting to a designation of beneficiary will always effect a transmutation.

Civil Code section 5110.730, subdivision (a) (hereafter section 5110.730 (a)), provides: "A transmutation of real or personal property is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected."

First, section 5110.730 (a) establishes a *formal* requirement for the validity of transmutations. The majority appear to interpret the provision merely as a rule governing *proof*. But such an interpretation founders on the very words of the code section: "A transmutation . . . *is not valid* unless" the requirement imposed is met. The language is clear. There is no reason for a court to look beyond the provision's words. But if it did so, there is certainly no reason to depart from their plain meaning.

Second, section 5110.730 (a) lays down a formal requirement *of definite content*. The majority discern ambiguity in the language of the provision. I do not. It states: "A transmutation . . . is not valid unless made in writing by an express declaration" that is binding on the adversely affected spouse. With these words the code section unmistakably, albeit impliedly, requires an express declaration *of transmutation*.

In sum, although I do not agree with the majority's construction of section 5110.730 (a), I do indeed agree with their result: the purported "transmutations" here are invalid. Therefore, I concur in the judgment.

**ARABIAN, J.,** Dissenting.—

## INTRODUCTION

If the decedent in extremis had in her last breath uttered the question, "Oh death, where is thy sting?," the majority garbed in grim shrouds would have whispered, "At probate."

It has been said that no good deed goes unpunished. Unhappily, there is a kernel of truth in this otherwise cynical aphorism, perfectly illustrated in the majority opinion, which begins its journey attempting to protect spouses against questionable transmutations of community property, and ends by negating the estate plan of the decedent herein, and of others who, like decedent, can no longer dictate their intentions. Worse, in exalting form over substance, the majority impose unnecessarily rigid requirements on the drafting and interpretation of future transfers between spouses. In the pro-

cess, they undermine the deference that trial courts deserve and merit on review. Therefore, I must respectfully dissent.

## BACKGROUND

In August 1984, Margery MacDonald (hereafter Margery or decedent) sadly learned that she had terminal cancer. Faced with mortality, she undertook the labor of finalizing her estate. Fortunately, it was a task to which she was well suited.

Margery had worked for many years as a bookkeeper with the accounting firm of Hemming-Morse in San Mateo. Indeed, it was there that she met her second husband, Robert MacDonald, who employed the firm to oversee the corporate accounts of his business, Robert F. MacDonald Company. After the couple married in 1973 (it was a second marriage for Robert, as well), Margery became employed as the bookkeeper for her husband's firm. In that capacity she kept the books, the balance sheets, the income statements, tax returns and payroll. In addition, she took responsibility for the couple's personal finances and was exceptionally aware of their assets.

Both Margery and Robert had children from their prior marriages. Margery wished to leave the bulk of her estate to her four children. Accordingly, the couple's immediate goal became the apportionment of their property into separate estates. To that end, the MacDonalds consulted with their personal accountant, Elizabeth Gommel, regarding their holdings and the division of assets. As Ms. Gommel recalled, "[Decedent's] immediate objective was to separate her assets . . . and have an entirely separate estate . . . . She wanted it as easy to administer as it possibly could be, that all assets would be separate, so there would be no reason for difficulties to arise between her heirs and Mr. MacDonald."

The MacDonalds divided their stock holdings and Margery sold her half and placed the proceeds into her separate account. In addition, she prepared a schedule of all the couple's real property holdings (in addition to their home in Hillsborough, the couple owned residences in Foster City, Pacific Grove, San Carlos, Sacramento, and Roseville), valued the properties and divided them with her husband; Robert paid $33,000 in cash to equalize the division.

Several months later, in November 1984, Robert reached the age of 65, and his company pension plan was terminated. On March 21, 1985, he received his pension disbursement of over $266,000; the money was imme-

diately deposited into three IRA accounts in separate financial institutions. These pension funds had not been previously addressed in the couple's efforts to divide their estate, although it was undisputed that Margery was aware of their existence.

The three IRA accounts were opened solely in Robert's name. The designated beneficiary of each was a living trust that Robert had established in 1982. The terms of the trust gave the bulk of the corpus to Robert's children from his earlier marriage. Each of the three IRA documents, entitled "Adoption Agreement and Designation of Beneficiary" (agreement), provided space for the signature of a spouse not designated as the sole primary beneficiary to allow consent for the designation. Margery signed the consent portion of each agreement.

Three months later, on June 17, 1985, Margery died. Her will bequeathed the residue of her estate to her four children. Thereafter, her daughter and executrix of her estate, Judith Bolton, filed a petition to establish decedent's community property interest in the IRA funds. Following a probate hearing, the trial court denied the petition, concluding that the IRA funds were not assets of decedent's estate. The court's conclusion was based on the following express findings: "1. Decedent Margery MacDonald, both because of her occupation and as a result of advice received from professionals was both competent to [sic] and sophisticated in the administration of her assets; [¶] 2. Decedent was active in the business of Respondent Robert F. MacDonald and was aware of the financial decisions being made in that business, particularly in terms of the pension plan itself; [¶] 3. Decedent was aware of the terms of the Living Trust which left the bulk of Respondent's estate to Respondent's children and left Decedent a life interest in the estate; [¶] 4. Decedent made conscious and substantial choices regarding her assets and sought to put her estate in order to eliminate the possibility of any dissension between her children and her spouse; [¶] 5. Decedent, in executing the Adoption Agreement for the three IRA's, intended to waive any community property right she had in those IRA's and in fact to transmute her share of that community property asset to the separate property of Respondent."

The Court of Appeal, with one justice dissenting, reversed. A majority of the court concluded that decedent's consent to the IRA agreements did not satisfy the provisions of Civil Code section 5110.730, subdivision (a),[1] which requires that transmutations of property be "made in writing by an express declaration that it is made, joined in, consented to, or accepted by the

---

[1] Unless otherwise indicated, all statutory references are to the Civil Code.

spouse whose interest in the property is adversely affected." Justice Holm-dahl, in dissent, would have held that the IRA agreements satisfied both the language and purpose of section 5110.730, subdivision (a).

## DISCUSSION

The narrow issue presented is whether, in order to satisfy the requirements of section 5110.730, subdivision (a), a writing must expressly state that the writer is effecting a transmutation of property. Conceding that the statutory language yields no ready answer, the majority turn to legislative history. From their reading of the pertinent sources, they conclude that the statute was intended to foreclose the courts from the use of extrinsic evidence to ascertain the writer's intent. An examination of those same historical sources, however, reveals that the majority's conclusion is fundamentally flawed; the plain evidence shows that the Legislature intended a simple writing requirement akin to the statute of frauds—a formality that would admit the use of collateral evidence to clarify the writer's meaning.

The primary source relied on by the majority is the California Law Revision Commission (Commission) Report to the Legislature recommending enactment of section 5110.730. (Recommendations Relating to Marital Property Presumptions and Transmutations, 17 Cal. Law Revision Com. Rep. (1984) (Commission report) pp. 205-227.) The Commission report is indeed enlightening, although it leads to a conclusion precisely the opposite of that reached by the majority. The salient portion of the Commission report reads as follows: "Under California law it is quite easy for spouses to transmute both real and personal property; a transmutation can be found based on *oral statements or implications from the conduct of the spouses*. [Fn. omitted.] [¶] California law permits an oral transmutation or transfer of property between the spouses *notwithstanding the statute of frauds*. [Fn. omitted.] . . . It encourages a spouse, after the marriage has ended, to transform a passing comment into an 'agreement' or even to commit perjury by manufacturing an oral or implied transmutation. [¶] Most people would find an oral transfer of such property, even between spouses, to be suspect and probably fraudulent, either as to creditors or between each other. [¶] California law should continue to recognize informal transmutations for certain personal property gifts between the spouses, but should require *a writing* for the transmutation of real property or other personal property." (Commission report, *supra*, at pp. 213-214, italics added.)

As the text of the Commission report thus makes clear, the statute was designed to overrule those decisions that had permitted transmutations "based on oral statements or implications from the conduct of the spouses."

The Commission report's frequent references to "oral" agreements and the possibility of "fraudulent" conveyances demonstrate that the purpose of section 5110.730 was to "require a writing" in the nature of the "statute of frauds." (Commission report, *supra*, at pp. 213-215.)

The Commission comment accompanying the text of section 5110.730 makes that intent even more plain: "Section 5110.730 imposes formalities on interspousal transmutations for the purpose of increasing certainty in the determination whether a transmutation has in fact occurred. Section 5110.730 makes clear that the *ordinary rules and formalities applicable to real property transfers apply also to transmutations of real property between the spouses. See Civil Code §§ 1091 and 1624 (statute of frauds)* . . . . This overrules existing case law. See, e.g., *Woods* v. *Security First Nat'l Bank*, 46 Cal.2d 697, 701, 299 P.2d 657, 659 (1956). *Section 5110.730 also overrules existing law that permits oral transmutations of personal property* . . . ." (Commission report, *supra*, at pp. 224-225, italics added.)

The Commission's explicit reference to "the ordinary rules and formalities applicable to real property transfers," in conjunction with its express citation to the statute of frauds (§ 1624), leaves no doubt as to the nature of the writing requirement contemplated by the statute's authors. The plain statement of intention to overrule *Woods* v. *Security-First Nat. Bank* (1956) 46 Cal.2d 697 [299 P.2d 657] (transmutation of real property based on oral agreement of the spouses) and the Commission report's explicit criticism of *In re Marriage of Lucas* (1980) 27 Cal.3d 808 [166 Cal.Rptr. 853, 614 P.2d 285] (finding a transmutation on the basis of a mobilehome document of title) underscore the legislative intent to create a simple writing requirement analogous to the statute of frauds. (Commission report, *supra*, at pp. 211, 222.)

That goal is evidenced further by the Commission's favorable reference to Reppy, *Debt Collection from Married Californians: Problems Caused by Transmutations, Single-Spouse Management, and Invalid Marriage* (1980) 18 San Diego L.Rev. 143 (hereafter Reppy). Like the Commission report itself, this article criticizes California's case law tradition of "easy transmutation," singling out for particular censure such cases as *Lucas*, *supra*, and *Woods*, *supra*, as well as *Pacific Mut. Life Ins. Co.* v. *Cleverdon* (1940) 16 Cal.2d 788 [108 P.2d 405] (husband's act of depositing funds into wife's separate account supports finding of intent to transmute to wife's separate property) and *O'Connor* v. *Travelers Ins. Co.* (1959) 169 Cal.App.2d 763 [337 P.2d 893] (wife's deposit of earnings to her separate account transmutes funds to her separate property). Consistent with the Commission's ultimate recommendation, the article calls for legislative enactment of a

"statute of frauds" to govern transmutations of property between spouses. (Reppy, *supra*, at p. 240.)

Thus, the historical sources—the *very* sources cited and relied on by the majority—demonstrate irrefutably that the underlying purpose of section 5110.730 was to overrule decisions permitting transmutations "based on oral statements or implications from the conduct of the spouses" (Commission report, *supra*, at p. 213), and to create the equivalent of a statute of frauds to govern transmutations of property between spouses. (*Id.* at p. 222.)[2]

California's general statute of frauds provides that certain specified contracts are invalid "unless they, or some note or memorandum thereof, are in writing and subscribed by the party to be charged or by the party's agent." (§ 1624.) To satisfy the statute, it is well settled that a writing must contain only the essential terms of an agreement, and that what is essential depends on the particular agreement and its context. (*Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752, 762-763 [206 Cal.Rptr. 354, 686 P.2d 1158].)

The modern trend of the law favors a liberal construction of writings in order to carry out the intentions of the parties. (*Sunset-Sternau Food Co.* v. *Bonzi* (1964) 60 Cal.2d 834, 838, fn. 3 [36 Cal.Rptr. 741, 389 P.2d 133]; *Okun* v. *Morton* (1988) 203 Cal.App.3d 805, 817 [250 Cal.Rptr. 220]; *Hennefer* v. *Butcher* (1986) 182 Cal.App.3d 492, 500-501 [227 Cal.Rptr. 318].)

---

[2] In response to the obvious thrust of the Commission report and the Reppy article, the majority advance two arguments. Neither is persuasive. First, they suggest that a simple writing requirement analogous to the statute of frauds would render mere surplusage the statutory language, "unless made in writing *by an express declaration* . . . ." (§ 5110.730, subd. (a).) This begs the question, of course, since the very issue we must decide is, an "express declaration" of *what*? The majority would require specific language stating that the writer is effecting a transmutation of property. The legislative history, however, demonstrates that the purpose was simply to impose a statute-of-frauds equivalent; as explained in the discussion which follows, any writing that evidences an *intent* to alter the character of property fulfills this requirement.

The majority also assert that the Legislature "cannot have intended that *any* signed writing whatsoever" would suffice, because some of the cases the statute was designed to overrule involved writings. Of course, the Commission report does not suggest that "any" signed writing would satisfy the statute, only those that meet the formalities of the statute of frauds. Moreover, the cases cited by the majority, *Nevins* v. *Nevins* (1954) 129 Cal.App.2d 150 [276 P.2d 655] and *In re Marriage of Lucas, supra,* 27 Cal.3d 808, plainly fail to meet this standard. Neither involved a writing that even remotely evidenced, on its face, an intent to change the character of property. *Nevins* held that a husband's intent to transfer his community property could be inferred from his income tax return. *Lucas,* as noted earlier, inferred an intent to transmute property from the title document to a mobilehome. Neither of the writings at issue in *Nevins* and *Lucas* would have complied with section 5110.730.

Ultimately, if the parties have completed a transaction in which it appears that they intended to make a contract, "the court should not frustrate their intention if it is possible to reach a fair and just result, even though this requires a choice among conflicting meanings and the filling of some gaps that the parties have left." (*Okun* v. *Morton, supra,* 203 Cal.App.3d at p. 817, quoting 1 Corbin on Contracts (1963) § 95, p. 400.) As we have previously explained, an " 'agreement will not be held deficient [under the statute of frauds] for the failure to express that which is clearly *implied* when the writing is interpreted in accordance with the intentions of the parties.' [Citations.]" (*Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co., supra,* 36 Cal.3d at p. 763, quoting *Seck* v. *Foulks* (1972) 25 Cal.App.3d 556, 568 [102 Cal.Rptr. 170], original italics.)

In light of these settled principles, it is evident that the Legislature could *not* have contemplated the strict test for compliance with section 5110.730 formulated by the majority. As noted, the legislative history reveals an intent to apply the "ordinary rules and formalities" associated with the statute of frauds. (Commission report, *supra,* at p. 225.) The Legislature, therefore, *must* have envisaged the introduction of extrinsic evidence where the writing, " 'interpreted in accordance with the intentions of the parties' " (*Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co., supra,* 36 Cal.3d at p. 763), demonstrates at least *an intent to transmute property pursuant to section 5110.730.*

Applying this test to the case at bar, it is clear that such an intention is readily discernible from the face of the IRA agreements. The transfer of the pension disbursement to Robert's IRA accounts involved a transfer of community property funds. The agreements contained an express declaration that the funds were being placed in Robert's name only. Decedent, the spouse whose interest was adversely affected, expressly consented to the designation of Robert's living trust, not herself, as the beneficiary. Thus, as contemplated by section 5110.730, the IRA documents plainly involved a transfer of property and contained an express consent to that transfer by the spouse whose interests were adversely affected.

To be sure, the agreements did not explicitly describe the pension funds as community property or expressly state that decedent intended to transfer her interest to Robert. By requiring her consent, however, the documents clearly alerted decedent to the fact that she had an interest in the funds for which a waiver was required.

The majority, nevertheless, assert that there is *no* substantial evidence to support the trial court's finding that decedent knew she had a community

property interest in the pension funds and intended to waive or transmute that interest. This is a patently selective reading of the record, contrary to the fundamental rule that a reviewing court must indulge all reasonable inferences in favor of the judgment. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) The trial court found, and the undisputed evidence showed, that decedent had worked as a bookkeeper for her husband's business and had managed the family's financial affairs. She was aware of her husband's pension plan. She consented to the designation of Robert's living trust as the beneficiary of the IRA funds. The amount was in excess of $250,000. For what conceivable reason would an intelligent and financially sophisticated woman consent to relinquish so large an interest to which she was not even entitled? It is an insult to the decedent, and a distortion of the appellate review process, to insinuate that decedent was ignorant of her interest in the IRA funds.

In applying the "ordinary rules and formalities" to transfers under section 5110.730, the Legislature intended to preserve the traditional rules that govern the interpretation of writings where the intent of the parties is in dispute and may depend, in part, on the evaluation of extrinsic evidence. (See *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861 [44 Cal.Rptr. 767, 402 P.2d 839].) The trial court here was in the best position to judge decedent's purpose, construed in light of the documents, the evidence, and the testimony and demeanor of the witnesses. In overruling that court's considered judgment, we not only contravene the legislative intent, but repudiate the necessary deference accorded trial courts in making such difficult determinations.

Worse, however, is the injury that the majority visits upon the decedent and others similarly situated. As her personal accountant testified, Margery's overriding interest, upon learning of her impending death, was to effect a clear allocation of assets in order to avoid any possibility of acrimony between Robert and her children. Her children were well provided for, having received substantial separate property and stock assets. The pension funds, though community property, were essentially the product of Robert's 35 years in business, most of which preceded his marriage to decedent; thus, Margery's election to waive and transfer any interest in those funds was eminently reasonable.[3]

There is no evidence of overreaching here, nor any hint of exploitation. There is only an effort by an obviously intelligent and courageous woman to

---

[3] Robert's defined benefit pension plan became effective in January 1977 and matured seven years later, in 1984; the distribution came to over $250,000. Although the payments into the plan occurred during the course of his marriage to decedent, Robert's substantial contributions during the seven short years that the plan was in existence were plainly the product of his three decades in business, most of which *preceded* his second marriage.

set her estate in order before her passing, to effectuate a clear and fair allocation of her assets. Her intentions were good, but as Shakespeare observed, "The evil men do lives after them; the good is oft interred with their bones."[4] The majority, sadly, prove the truth of that statement.

On September 6, 1990, the opinion was modified to read as printed above.

---

[4] Shakespeare, Julius Caesar, act III, scene 2.