81 Cal.Rptr.2d 726 (1999)
69 Cal.App.4th 583
In re the MARRIAGE OF Robert L. and Evelyn Kaiser BARNESON.
Michael McGirr, as Executor, etc., Appellant,
v.
Evelyn Kaiser Barneson, Respondent.
No. A080323.
Court of Appeal, First District, Division Two.
January 26, 1999.
*727 Law Offices of Peter G. Lowenstein, New York City, Kathleen A Murphy, Tanke & Willemsen, Tony J. Tanke, Redwood City, Karen Bautista Hobin, for Appellant.
Robert Kent Brewer, San Francisco, for Respondent.
KLINE, P.J.
Michael McGirr, executor of the estate of Robert L. Barneson, appeals from a trial court order finding certain transfers of stock from the decedent into the name of his then-wife constituted transmutations of his separate property into her separate property under Family Code section 852, subdivision (a). Appellant contends the writings pursuant to which the transfers were effected did not contain the "express declaration" required by statute and case law.[1]

*728 STATEMENT OF THE CASE AND FACTS

Robert L. Barneson ("Barneson") and Evelyn Kaiser Barneson ("Kaiser") were married on August 10, 1988. Barneson was 65 years old and Kaiser almost 36. At the time of the marriage, Barneson owned a multi-million dollar stock portfolio. In November of 1989, Barneson suffered a stroke.
Barneson signed a typed letter dated December 6, 1990, to Banker's Trust Company ("Banker's Trust"), referring to certain stock in Marina Oil Company, which stated as follows: "This is written instruction as per our phone conversation. I Robert L. Barneson would like to combine these (4) four stock certificates into one, I would like to transfer these same stocks into the name of Evelyn J. Kaiser. Thank you."[2] Banker's Trust received the four stock certificates on December 6, 1990; its receipt bears the notation, "Waiting for bond power." At some point, Barneson executed an "Irrevocable Stock or Bond Power," with his signature guaranteed by an officer of Charles Schwab & Co., Inc. This form document begins with the phrase "For value received, the undersigned does (do) hereby sell, assign, and transfer unto," after which the name Evelyn Kaiser was written. The remainder of the form above the signature spaces, calling for such information as number of shares, name of stock and amounts, was left blank and the form was not dated. Banker's Trust combined the four stock certificates, which had been in Barneson's name, into one certificate, dated December 6, 1990, and issued in the name of "Evelyn J. Kaiser, c/o Robert L. Barneson." Stock dividends continued to be reported to the Internal Revenue Service under Barneson's Social Security number. Kaiser subsequently instructed Banker's Trust to remove the "c/o" designation on the certificate. An exchange journal entry reflects Banker's Trust having done so, although the entry lists Barneson's Social Security number on both sides of the transaction.
On February 3, 1986, Barneson had opened an account with Charles Schwab & Co, Inc. ("Schwab") in his name alone. Kaiser opened an account in her name alone in December 1990. On December 5, 1990, Schwab "received" into Barneson's account a number of different stocks. Barneson signed 10 forms authorizing transfer of these stocks into Kaiser's name. Each of these authorizations began with the words "This is your written authorization to transfer _____ shares of _____ into the following name(s):" and was completed with Kaiser's name, address and Social Security number. The December 1990 statement for Kaiser's account shows these stocks as "journaled shares" in her account as of December 10.
Additional stocks were "received" in Barneson's account on December 19, 1990, and on January 17, 1991. Schwab also received a number of stock certificates in Barneson's name, with an unsigned letter, over Barneson's typed name, stating: "Enclosed you will find (8) eight bond powers, also several stock certificates listed below. Please transfer the ones you can, and put the remainder on deposit." Among the stock certificates was the one for Marina Oil discussed above, which had been issued in Kaiser's name "c/o" Barneson. On January 25, 1991, Schwab representative Stacey Houston wrote to Barneson, stating that six of the certificates, including Marina Oil, could not be accepted into his account.[3] Barneson at some point signed a request to journal "all stock" in his account into Kaiser's account. On March 20, 1991, the stock in Barneson's account was journaled into Kaiser's account.
Barneson admitted at trial that the securities transfers met the procedural requirements of the Securities and Exchange Commission.
Barneson filed a petition for dissolution of marriage on June 9, 1992, and sought return of the stock transferred to Kaiser. Barneson and Kaiser were divorced, but Barneson died before the property issues *729 were resolved, The case has since been pursued by the executor of his estate.[4]
On May 1, 1997, the trial court ordered a separate trial, to be heard ahead of other issues, on the question of validity of the transmutation of Barneson's separate property interests in the securities described above to ownership in Kaiser's name. The matter was submitted on the pleadings; the court excluded evidence by experts and ordered Barneson's expert's declaration and the transcript of Kaiser's deposition "removed from the binder."
After a hearing on June 23, 1997, the court filed a statement of decision concluding the "three transfers of security interests ... are effective. They do not fail due to the requirements of Family Code § 852(a) and Estate of MacDonald (1990) 51 Cal.3d 262, 272 Cal.Rptr. 153, 794 P.2d 911."[5] On July 11, the executor moved for certification of probable cause for immediate appeal of the trial court's decision.
On September 8, 1997, the trial court filed its "Order Following Trial on Bifurcated Issue: Validity of Transmutations Pursuant to Family Law Code, Section 852(a)." This order concluded: "The three alleged transfers of security interests ... are not invalid as having failed to meet the requirements of Family Code Section 852(a) and Estate of MacDonald (1990) 51 Cal.3d 262, 272 Cal. Rptr. 153, 794 P.2d 911." Also on September 8 the trial court filed its order certifying probable cause for immediate appeal of its order following trial.
After an extension of time to appeal granted by the trial court, the executor filed in this court on October 14, 1997, his motion for leave to appeal the bifurcated issue. (Cal. Rules of Court, rule 1269.5.) The motion was granted on November 20, 1997.

DISCUSSION
The question in the present case is whether the trial court was correct in determining that Barneson's actions in transferring the Marina Oil stock and the securities in his Schwab account into Kaiser's name effectively transmuted the securities from his separate property into her separate property. The issue is governed by Family Code section 852, subdivision (a), which provides: "A transmutation of real or personal property is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected."[6] The California Supreme Court, in Estate of MacDonald (1990) 51 Cal.3d 262, 272, 272 Cal.Rptr. 153, 794 P.2d 911, interpreted the "express declaration" provision of the identically worded predecessor to section 852, subdivision (a), as requiring language which expressly states that a change in the characterization or ownership of the property is being made. The determination whether the language of a writing purporting to transmute property meets the MacDonald test must be made by reference to the writing itself, without resort to parol evidence. (Id., at pp. 271-272, 272 Cal.Rptr. 153, 794 P.2d 911.) As a matter of interpretation of written documents, the determination is subject to independent review by this court. (See, Cox Cable San Diego, Inc. v. City of San Diego (1987) 188 Cal.App.3d 952, 958, 233 Cal.Rptr. 735.)
As a preliminary matter, Kaiser asserts the trial court did not rule that transmutations of property had occurred but only that the transfers of securities were valid under section 852, subdivision (a). According to Kaiser, the trial court could not have ruled that transmutations had occurred because it did not hear issues regarding sections 850 et seq., which were outside the scope of the ruling granting bifurcation.
While it is not immediately apparent what provisions of sections 850 et seq., other than section 852, subdivision (a), might be *730 relevant to this case, the broad question whether a valid transmutation of property has taken place depends not only on compliance with the provisions of section 852 but also upon compliance with rules governing fiduciary relationships. (In re Marriage of Haines (1995) 33 Cal.App.4th 277, 293-294, 39 Cal.Rptr.2d 673.) "When an interspousal transaction advantages one spouse, `[t]he law, from considerations of public policy, presumes such transactions to have been induced by undue influence.' [Citation.] `Courts of equity ... view gifts and contracts which are made or take place between parties occupying confidential relations with a jealous eye.' [Citation.]" (Ibid.) Thus, the requirements of section 852 are prerequisites to a valid transmutation but do not necessarily in and of themselves determine whether a valid transmutation has occurred. The trial court in the present case, at this juncture, did not consider or decide any issues relating to undue influence, but only determined the threshold issue that the transfers in question here met the requirements for a transmutation under section 852, subdivision (a). Kaiser's distinction between transfers and transmutations is misleading and confusing: Section 852 by its terms deals with transmutations of property. Kaiser is correct, however, that the only issue before us on this appeal is the narrow question whether the requirements of section 852, subdivision (a), were satisfied.[7]
In MacDonald, supra, spouses who had each been married previously and had children by their prior marriages took action to divide their property into separate estates after the wife learned she had terminal cancer. Wishing to leave her property to her own children, the wife divided the couple's jointly held stock and sold her half; the couple then had their jointly held real property appraised and divided it. When the husband received a $266,557 disbursement from his pension plan, in which the wife possessed a community property interest, the money was placed in IRA accounts in his name, with the beneficiary designated as a revocable living trust the husband had established as beneficiary of the pension plan. The financial institutions' forms for these accounts, entitled "`Adoption Agreement and Designation of Beneficiary'" provided space for a spouse not designated as the sole beneficiary to indicate consent to the designation. The wife signed these consent portions of the forms. (51 Cal.3d at pp. 265-266, 272 Cal. Rptr. 153, 794 P.2d 911.)
MacDonald held the wife's signature on these forms was not sufficient to support a finding of transmutation: The consent paragraphs contained no language characterizing the property; it was not possible to tell from the face of the documents whether the wife was "aware that the legal effect of her signature might be to alter the character or ownership of her interest in the pension funds;" and there was no language "expressly stating that [the wife] was effecting a change in the character or ownership of her interest." (51 Cal.3d at pp. 272-273, 272 Cal.Rptr. 153, 794 P.2d 911.) The MacDonald court noted that the "express declaration" requirement did not mean a writing must use any particular term (such as "transmutation," "community property" or "separate property") and suggested the document in that case would have been sufficient if it had included the additional provision "`I give to the account holder any interest I have in the funds deposited in this account'" (Id., at p. 273, 272 Cal.Rptr. 153, 794 P.2d 911.)
In the present case, the Marina Oil stock certificate was issued in Kaiser's name after Barneson signed a typewritten letter to Banker's Trust stating: "This is written instruction as per our phone conversation. I Robert L. Barneson would like to combine these (4) four stock certificates into one, I would like to transfer these same stocks into the name of Evelyn J. Kaiser. Thank you." In connection with this transaction, Barneson executed an "Irrevocable Stock or Bond Power," with his signature guaranteed by a Schwab officer, stating: "For value received, the undersigned does (do) hereby sell, assign, *731 and transfer unto Evelyn Kaiser" an unspecified number of shares in unspecified stock. The stock in Barneson's Schwab account was journaled into Kaiser's account upon Barneson's signed authorizations to transfer specified stock into her name and signed a request to journal all stock in his account into Kaiser's account.
Nothing in Barneson's directions to "transfer" his Marina Oil stock into Kaiser's name or to "transfer" or "journal" the stock in his Schwab account into Kaiser's account "expressly state[d] that the characterization or ownership of the property [was] being changed." (Estate of MacDonald, supra, 51 Cal.3d at p. 272, 272 Cal.Rptr. 153, 794 P.2d 911.) "Transfer" is not a word with a single meaning. The term "transfer," as Kaiser notes, is defined in Black's Law Dictionary as follows: "To convey or remove from one place, person, etc., to another; pass or hand over from one to another; specifically, to change over the possession or control of (as, to transfer a title to land). To sell or give." "Possession" is in turn defined as "[h]aving control over a thing with the intent to have and exercise such control." "Control" is defined as "[p]ower or authority to manage, direct, superintend, restrict, regulate, govern, administer, or oversee. The ability to exercise a restraining or directing influence over something." Possession is not synomous with ownership. Indeed, volume 12 Oxford English Dictionary (2d edition 1989) defines "possession" as "[t]he action or fact of possessing, or condition of being possessed... the holding or having something (material or immaterial) as one's own, or in one's control, actual holding or occupancy, as distinct from ownership." (Italics added.) Thus, while the term "transfer" could refer to a change in ownership, it does not necessarily do so. The fact that the term "transfer" carries multiple definitions demonstrates the ambiguity in Barneson's direction to "transfer" stock.
Respondent's assertion that Barneson "directed that `ownership' be changed" is incorrect: Barneson only directed "transfer" of the stocks to Kaiser, without specifying what interest was to be transferred. Respondent's description of MacDonald as requiring only that the words of the document purportedly effecting a transmutation "evidence that a transfer itself is intended" is inaccurate: MacDonald does not speak in terms of "transfers" but requires "language which expressly states that the characterization or ownership of the property is being changed." (51 Cal.3d at p. 272, 272 Cal.Rptr. 153, 794 P.2d 911.) "Transfer" is clearly not synonymous with "transmutation," as is evident from the language of sections 850 and 852. Section 850 provides that spouses may "transmute" property "by agreement or transfer;" section 852 then states the requirements for a valid "transmutation." A transmutation may be effected by means of a transfer, but a transfer is not necessarily a transmutation.
The request to "journal" stock from Barneson's Schwab account into Kaiser's is even less indicative of a change in ownership. To "journal" is, according to the Oxford English Dictionary, to "record in a journal;" "journalize" is "[t]o enter in a journal or book for daily accounts" or "to enter, record, or describe in or as in a private journal." The term "journal" would appear to refer to Schwab's internal record-keeping; at most, in this context, it would be synonymous with "transfer."
Nor do Barneson's directions to place his stock in Kaiser's name necessarily demonstrate a change in ownership.[8] For example, Barneson may simply have intended to enable Kaiser to more easily manage his financial affairs for him after his stroke in other words, he may have intended to transfer management of the property without changing its ownership or characterization. Nothing on the face of the documents upon which the transmutation claim is based precludes the possibility the transfer was made *732 in trust. While no such indication appears on the documents themselves, a trust need not be created in a single instrument (Reagh v. Kelley (1970) 10 Cal.App.3d 1082, 1090, 89 Cal.Rptr. 425); here, since securities and not real property are at issue, the stocks could even have been made the subject of an oral trust. (Bank of America v. Long Beach etc. Assn. (1956) 141 Cal.App.2d 618, 623, 297 P.2d 443; Hardison v. Corbett (1942) 55 Cal. App.2d 310, 317, 130 P.2d 226.) We do not suggest there is evidence of such a trust in the present case, nor that we could directly consider such evidence in determining whether Barneson's directives transmuted his property within the meaning of section 852, subdivision (a)as stated above, the determination whether the MacDonald test has been met must be made without resort to parol evidence. (Id., at pp. 271-272, 272 Cal.Rptr. 153, 794 P.2d 911.) The point is simply that a direction by a spouse to transfer stock into his spouse's name does not unambiguously indicate the ownership of the stock is being changed.[9]
Kaiser relies upon Evidence Code section 662 to argue that Barneson could not rebut the statutory presumption that she held full beneficial title to the stock placed in her name. Evidence Code section 662 provides: "The owner of the legal title to property is presumed to be the owner of the full beneficial title. This presumption may be rebutted only by clear and convincing proof." Kaiser argues that as a result of Barneson's transfers she held legal title to the stocks without any stated exceptions, Barneson could have rebutted the presumption of full ownership only by clear and convincing evidence, and this could not be accomplished because of the trial court's order precluding introduction of extrinsic evidence.
If Kaiser's reasoning were correct, evidence of a transfer of legal title would necessarily demonstrate a transmutation under section 852, subdivision (a), in every case, as the fact the transmutation determination must be made without resort to extrinsic evidence (MacDonald, supra, 51 Cal.3d at pp. 271-272, 272 Cal.Rptr. 153, 794 P.2d 911) would preclude rebutting the Evidence Code section 662 presumption. The overall validity of the transmutation could then be challenged by use of extrinsic evidence to prove a factor such as undue influence. (In re Marriage of Haines, supra, 33 Cal.App.4th 277, 293-294, 39 Cal.Rptr.2d 673.)
Haines dealt with the conflict between the Evidence Code section 662 presumption from title and the presumption of undue influence that arises when one spouse gains advantage over the other. (33 Cal.App.4th at pp. 295-298, 39 Cal.Rptr.2d 673.) In that case, the wife in a dissolution action attempted to show that a deed by which she transferred her interest in a then-jointly owned house to her husband was procured by undue influence, duress and fraud. The trial court concluded the wife had failed to meet the burden of proof by clear and convincing evidence necessary to rebut the presumption of ownership created by Evidence Code section 662 but noted that the wife had proved her claims by a preponderance of the evidence. The facts were such that the husband had gained an advantage over the wife in the transaction at issue. Had the trial court applied the presumption of undue influence, the burden would have been on the husband to prove the transaction had not been consummated in violation of his fiduciary duties; he would not have been able to do so, given the trial court's determination that the wife had established her claims by a preponderance of the evidence. Haines held Evidence Code *733 would conflict with the presumption of undue influence, because a contrary holding would "abrogate the protections afforded to married persons and denigrate the public policy of the state that seeks to promote and protect the vital institution of marriage." (Id., at p. 302, 39 Cal.Rptr.2d 673.)
MacDonald's interpretation of the "express declaration" language in section 852, subdivision (a), can be viewed as effectively creating a "presumption" that transactions between spouses are not "transmutations," rebuttable by evidence the transaction was documented with a writing containing the requisite language. Like Haines, MacDonald, was based in part on a policy of "assuring that a spouse's community property entitlements are not improperly undermined." (51 Cal.3d at p. 273, 272 Cal.Rptr. 153, 794 P.2d 911.) By analogy to Haines, the Evidence Code section 662 presumption of ownership should not be used to defeat the purposes of section 852, subdivision (a). As we have discussed, the direction to "transfer" an asset into a different name does not necessarily connote an intention to change beneficial ownership. In our view, the more specific rules governing transmutations of property in transactions between spouses should control over the more general presumption of ownership from title created by Evidence Code section 662. (See, Haines, supra, 33 Cal.App.4th at p. 301, 39 Cal.Rptr.2d 673 [in case of conflict, more specific presumption controls over more general one].) Where the transaction purportedly resulting in a transmutation of property falls short of the MacDonald test, the section 662 presumption should not be applied.
It may be noted that Kaiser's Evidence Code section 662 argument essentially sidesteps the inquiry required by MacDonald by basing the transmutation determination on the result of the writing purportedly effecting a transmutation rather than on interpretation of the writing itself. It also renders the Evidence Code section 662 presumption irrebuttable in the context of interspousal transfers, as the transmutation determination must be made without resort to extrinsic evidence.
We recognize that the facts before us differ from those in MacDonald and present a Barneson's written directions to transfer stock "contain no language which characterizes the property assertedly being transmuted" and "[i]t is not possible to tell from the face of [the documents] whether decedent was aware that the legal effect of [his] signature might be to alter the character or ownership of [his] interest in the [property]." The Supreme Court in MacDonald made very clear that it was attempting to effectuate legislative intent by creating a bright line test for evaluation of purported transmutations. The MacDonald test is not difficult to meet: It requires only a clear demonstration of a change in ownership or characterization of the property at issue. Here, if Barneson had truly intended a transmutation, he could have added to his directions to transfer stock a sentence indicating he was giving his interest in the stocks to Kaiser; he could even have directed them transferred into her name "as her sole and separate property." In the absence of such language, the documents are not sufficient to demonstrate a transmutation under section 852, subdivision (a).
We are not persuaded to the contrary by Kaiser's argument that "commercial transfer documents be required to specify the intent of the transferror" would create an "extreme burden upon the industries accomplishing such transfers" and invade the privacy of the transferror. It must be remembered that the only transactions affected by our decision, as by MacDonald, are ones between spouses, whose transactions with each other are judged by fiduciary standards. (See, In re Marriage of Haines, supra, 33 Cal. App.4th at p. 293, 39 Cal.Rptr.2d 673.) The requirements of section 852, subdivision (a), necessarily arise only in the context of transfers of property between spouses.
The trial court's decision on the bifurcated issue is reversed. Each party to bear own costs.
HAERLE, J., and LAMBDEN, J., concur.
NOTES
[1] On the eve of oral argument, this court was informed the parties had settled the case and appellant filed a voluntary dismissal. After the record on appeal is filed, dismissal of the action based on abandonment or stipulation of the parties is discretionary, not mandatory. (Cal. Rules of Court, rule 19(b); Lundquist v. Reusser (1994) 7 Cal.4th 1193, 1202, fn. 8, 31 Cal.Rptr.2d 776, 875 P.2d 1279.) "We have inherent power to retain a matter, even though it has been settled and is technically moot, where the issues are important and of continuing interest." (Burch v. George (1994) 7 Cal.4th 246, 253, fn. 4, 27 Cal. Rptr.2d 165, 866 P.2d 92; see also, Liberty Mut. Ins. Co. v. Fales (1973) 8 Cal.3d 712, 715-716, 106 Cal.Rptr. 21, 505 P.2d 213; Lundquist v. Reusser, supra, 7 Cal.4th at p. 1202, fn. 8, 31 Cal.Rptr.2d 776, 875 P.2d 1279.) The issue in the present case meets these criteria, as it potentially affects numerous interspousal transfers of property in California. Accordingly, at the suggestion of counsel for the executor and with the consent of counsel for Kaiser, we follow established precedent in retaining jurisdiction to resolve the legal issue here presented. (See, Lundquist v. Reusser, supra, 7 Cal.4th at p. 1202, fn. 8, 31 Cal.Rptr.2d 776, 875 P.2d 1279 [parties settle two weeks before oral argument]; Burch v. George (1994) 7 Cal.4th 246, 253, fn. 4, 27 Cal. Rptr.2d 165, 866 P.2d 92 [parties settled while matter pending in Supreme Court]; Abbott Ford, Inc. v. Superior Court (1987) 43 Cal.3d 858, 868, fn. 8, 239 Cal.Rptr. 626, 741 P.2d 124 [parties settled while matter pending in Supreme Court]; Rosales v. Thermex-Thermatron, Inc. (1998) 67 Cal.App.4th 187, 191, fn. 1, 78 Cal.Rptr.2d 861 [parties stipulated for dismissal after rehearing granted].)
[2] Appellant concedes for purposes of this appeal alone that the signatures on the transfer documents at issue here were Barneson's, stating the concession will not apply in subsequent proceedings.
[3] Regarding Marina Oil, the letter indicated: "This is not trading as a security on any exchange, it appears to be a note of some type. We are unable to hold."
[4] Although Barneson died on December 29, 1996, the record does not reflect the caption of the case being changed to name the executor as petitioner instead of Barneson until after September of 1997.
[5] The trial court's initial statement of decision was filed on July 3, with an amendment replacing the first paragraph thereof filed on July 11.
[6] All further statutory references will be to the Family Code unless otherwise specified.
[7] Barneson's references to matters such as Kaiser's testimony that Barneson's letter to Banker's Trust was typed by Kaiser's boyfriend are irrelevant to the interpretation of the document and, as the trial court correctly recognized, inadmissible under (MacDonald, supra, 51 Cal.3d at pp. 271-272, 272 Cal.Rptr. 153, 794 P.2d 911.)
[8] That the stock was in fact placed in Kaiser's account, as reflected on her Schwab statement, would not be sufficient to demonstrate a transmutation. (See, Estate of Petersen (1994) 28 Cal. App.4th 1742, 1754-1755, 34 Cal.Rptr.2d 449 [account statement identifying spouses as joint tenants insufficient to transmute community property funds placed into account into joint tenancy].)
[9] Kaiser in fact testified at her deposition that after his stroke, Barneson told her about his financial affairs because he loved her and wanted to take care of her, and because he wanted her to help manage his affairs. Kaiser testified she and Barneson created a plan whereby she would "manage his affairs and if anything should happen to him, that [she] would see to it that [she] would set up a trust fund for his grandchildren. And also for my niece's two sons and she didn't have her little girl at that time." While this testimony is irrelevant to the transmutation issue, we note it simply to illustrate one possible meaning of Barneson's direction to transfer the stock into Kaiser's name.

It is also interesting to note that Banker's Trust apparently did not understand Barneson to have given up his ownership interest in the Marina Oil stock, as it continued to report payments on the stock to the Internal Revenue Service under Barneson's Social Security number.