Filed 8/21/20  Marriage of Tascher & Aguilar CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of ROSA TASCHER and RICARDO PORTILLO AGUILAR. | D074727 |
| ROSA TASCHER,<br><br>        Respondent,<br><br>        v.<br><br>RICARDO PORTILLO AGUILAR,<br><br>        Appellant. | (Super. Ct. No. EFL17874) |

APPEAL from a judgment of the Superior Court of Imperial County, Juan Ulloa, Judge.  Affirmed.

Law Offices of Francisco Javier Aldana and Francisco Javier Aldana for Appellant.

Gonzalez & Garcia, Jorge C. Gonzalez and Francisco J. Garcia for Respondent.

## I.

## INTRODUCTION

Appellant Ricardo Portillo Aguilar appeals from a judgment of the trial court dissolving Aguilar's marriage to respondent Rosa Tascher. Aguilar challenges the trial court's characterization of the family home as Tascher's separate property, the court's award of spousal support to Tascher, and the court's division of certain of the parties' assets. We conclude that Aguilar's arguments with respect to the characterization of the family home as Tascher's separate property are without merit. We further conclude that Aguilar has forfeited his contentions regarding spousal support and the division of assets, and that even if these contentions were not forfeited, they would fail on their merits. We therefore affirm the judgment.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Tascher filed a petition for dissolution of her marriage to Aguilar on October 23, 2015. The matter proceeded to a trial, which was held over a number of days between October 2017 and February 2018.

Among the relevant matters testified to at trial, Tascher testified that the property in dispute between the parties is a residence located on West Rocking Horse Lane in Heber, California (the Rocking Horse property).[1] Although the Rocking Horse property was purchased during the parties' marriage, Aguilar took title to the property in his name, solely, as his separate property. However, on two separate occasions, Aguilar executed

---

[1] Because Aguilar has elected to provide a record of what occurred at trial through the submission of a settled statement, we refer to that document for purposes of reciting the testimony of the parties and other witnesses as offered at trial with respect to the issues in controversy.

2

deeds transferring the Rocking Horse property to Tascher as her separate property.[2]

Tascher testified that in September 2013, Aguilar drove to the office of Notary Public Hilda Lopez Flores in Calexico, "for the sole purpose of signing the Deed" that reflected what Tascher understood to be Aguilar's intent to transfer all of his interest in the property to her as her separate property. Tascher further testified that Aguilar told her that he was transferring the Rocking Horse property to her, and that "he was under no stress or duress." The September 2013 deed was recorded on May 29, 2014. According to Tascher, "[i]t was discovered later[ ] that the [l]egal [d]escription was lost or not recorded with the Grant Deed." Aguilar then agreed to execute a new deed "in order to 're-record this document to add the legal description.' " Tascher testified that Aguilar drove to her home in May 2015 to sign a new grant deed assigning the Rocking Horse property to her as her separate property. A different notary public and a third individual witnessed Aguilar sign the May 2015 deed.

According to Tascher, after Aguilar executed the September 2013 deed, she made all of the mortgage payments on the property, and she, alone, paid the taxes on the property and covered all repairs and maintenance. Tascher's aunt, R. Herrera, testified that she lives a few blocks from the Rocking Horse residence. She had known Aguilar for 10 years, and he regularly confided in her regarding his marriage to Tascher. At some point, Aguilar told Herrera that he wanted to give Tascher the Rocking Horse house, and he asked for Herrara's assistance in obtaining the paperwork necessary to give Tascher the home. Herrera sought the assistance of Irene Canamar, who worked at

---

[2]    As we explain further, there was a need for a second deed because of a perceived failure to meet the requirements for recording in the first deed.

an escrow company, to prepare at least one of the grant deeds. Herrera obtained a grant deed from Canamar and mailed it to Aguilar.

Tascher also testified that she was aware of the existence of a domestic violence restraining order that had been issued to restrain her from contacting Aguilar. However, according to Tascher, despite the restraining order, Aguilar "would freely visit her home and continued to use her address for bills and business correspondence, which he would pick up there." A woman who rented a room at the Rocking Horse residence between May 2014 and May 2015 testified that she saw Aguilar's vehicle parked in front of Tascher's home "daily." According to Tascher, Aguilar "wanted to reconcile their marriage," and on May 8, 2015, Aguilar "signed a request to Terminate the Domestic Violence Restraining Order."[3]

Aguilar testified that his marital relationship with Tascher ended in July 2013, and he began moving things out of the family home in July 2014.

Aguilar testified that Tascher abused him during the marriage, and that she violated a restraining order that was in place to protect him "on many occasions." Aguilar denied ever having signed a document requesting the termination of a restraining order, and claimed at trial that his signature had been forged. On cross-examination, Aguilar admitted that he had handwritten "portions of the Request to terminate Restraining Order, dated May 8, 2015," but still claimed that he did not recall signing the document.

With respect to the Rocking Horse property, Aguilar testified that he signed two deeds, at Tascher's request, in order "to 'add her name to the property.'" Aguilar stated that he "relied on [Tascher's] assertion and

---

[3]    While the summary of the testimony of both Tascher and Aguilar included in the Settled Statement suggests that this document was shown to both of them during the trial, no document with this title or a similar title was admitted in evidence.

4

intended only to add her name to the title," and claimed that he had not read or understood the deeds or their effect. Aguilar further testified that he did not know the notary public, Hilda Lopez Flores, and claimed that he had never been inside of Flores's office. However, during cross-examination, Aguilar admitted that he "voluntarily and knowingly signed the September 13, 2013 Grant Deed," and admitted that he had picked up Tascher from the Rocking Horse property and driven them both to Flores's office in Calexico. Aguilar indicated that the "sole purpose" of their drive to Calexico "was to execute the document." Aguilar also admitted that Flores had, in fact, prepared his tax returns prior to 2013, at the same Calexico office where Aguilar and Tascher had gone to have the September 2013 deed executed, contradicting his earlier testimony that he did not know Flores.

Aguilar testified that "a few days before May 5, 2015[, Tascher] called him and asked him to sign a second Deed." He conceded that he "freely and voluntarily drove to [Tascher's] home in Heber on May 8, 2015 to sign the Grant Deed." According to Aguilar, he signed the May 2015 deed because " '[a]ll [he] wanted [wa]s for it to be over.' " At that time, Aguilar signed the grant deed and another document. Aguilar also admitted at trial that his 2016 individual federal tax return indicates that he transferred the Rocking Horse property to Tascher. He wrote in the tax return, " 'I transferred the home to my spouse (or ex-spouse as part of my divorce settlement). The full name of my ex-spouse is Rosa Tascher.' " Aguilar testified on cross-examination that his 2016 tax return "was fraudulent, that he lied on the return because[ ] '[he] needed the money.' "[4]

---

[4]     The Settled Statement is ambiguous as to whether Aguilar's testimony regarding the filing of a fraudulent 2016 tax return is related to his statement that he had transferred the home to Tascher.

5

Aguilar testified that he did not understand English. Yet he provided some of his testimony in English, and he admitted that he had successfully passed carpentry examinations that were conducted in English.

At the conclusion of the trial, the trial court directed counsel for the parties to submit written closing arguments in the form of proposed Statements of Decision, which the parties were to file and serve on each other. The court also permitted each party to file objections to the other party's submission.

After receiving the parties' submissions, the trial court issued a tentative Statement of Decision on June 29, 2018. Neither party filed any objections to the proposed Statement of Decision within the 10-day period for registering objections to the tentative ruling. The tentative Statement of Decision thus became the court's final Statement of Decision. In that Statement of Decision, the court specifically concluded that any presumption of undue influence that had arisen in the transmutation of the Rocking Horse property from Aguilar's separate property to Tascher's separate property had been "overcome."

The trial court entered judgment in the matter on August 7, 2018. The judgment, as entered, includes an attachment indicating a property division between the parties that is consistent with the court's Statement of Decision. In that attachment, the court indicates that Tascher possesses the Rocking Horse property as her separate property. The court specifically found that there had been a "valid transmutation" of the property, causing it to become Tascher's sole and separate property, in 2013. The court divided the community property assets between the parties as well, awarding Tascher a 2003 Lincoln Navigator and a 2000 Chevrolet Silverado, while awarding Aguilar a 2002 Jaguar X-Type. The court further indicated that a 2004 food

6

truck had been sold during the marriage and found that the proceeds had been spent by both parties on household expenses. With respect to tools that Aguilar had apparently suggested belonged to him, the court found that "there was no credible testimony to establish the existence and/or value of any tools."

The court also awarded Tascher spousal support in the amount of $350.00 per month, for four years nine months, which is half of the length of marriage. Finally, the court awarded Tascher $4,000 in attorney fees and costs.

Aguilar filed a timely notice of appeal.

## III.

## DISCUSSION

A. *Substantial evidence supports the trial court's determination that Aguilar knowingly and willingly transferred the Rocking Horse property to Tascher, and that any presumption of undue influence was overcome*

Aguilar challenges the trial court's determination that the Rocking Horse property is Tascher's separate property. He offers a number of assertions as to why the court's determination with respect to this property is erroneous. For example, he argues that he signed the deeds of trust under duress, citing the fact that a domestic violence restraining order was in place against Tascher at the time the second deed of trust was signed, and that as a result, the presumption that an intraspousal transfer that advantages one spouse was induced by undue influence was not overcome. He also argues in a separate section of his brief that the trial court "failed to give appropriate weight to the documented history of domestic violence perpetrated against [Aguilar] by [Tascher]," and asserts that the trial court "trivialized the domestic violence." Finally, Aguilar asserts that the May 2015 deed of trust

7

is "void as illegal" because "it was executed in violation of a restraining order issued by the trial court."

1. *Relevant legal standards*

The characterization of property involves " 'the process of classifying property as separate, community, or quasi-community.' [Citation.]" (*In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 91.) As a general rule, property that is acquired prior to marriage is the separate property of the acquiring spouse. (Fam. Code,[5] § 770, subd. (a)(1).) Conversely, all property acquired during marriage is presumptively community property. (§ 760; see *Ciprari, supra*, at p. 91 [there is a "basic presumption" that property acquired during marriage is community property].) However, "spouses may agree to change the status of any or all of their property through a property transmutation. [Citation.] A transmutation is an interspousal transaction or agreement that works a change in the character of the property." (*In re Marriage of Campbell* (1999) 74 Cal.App.4th 1058, 1062.) Section 850 sets forth the various potential transmutations that may be effectuated by spouses:

> "Subject to Sections 851 to 853, inclusive, married persons may by agreement or transfer, with or without consideration, do any of the following:
>
> "(a) Transmute community property to separate property of either spouse.
>
> "(b) Transmute separate property of either spouse to community property.

---

[5] All further statutory references are to the Family Code unless otherwise indicated.

"(c) Transmute separate property of one spouse to separate property of the other spouse."[6]

A transmutation of real or personal property is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected. (§ 852.) As interpreted by courts, section 852, subdivision (a) requires "(1) a writing that satisfies the statute of frauds; and (2) an expression of intent to transfer a property interest." (*Estate of Bibb* (2001) 87 Cal.App.4th 461, 468 (*Bibb*); *In re Marriage of Holtemann* (2008) 166 Cal.App.4th 1166, 1172.) Further, the "express declaration" language requires a writing that on its face coveys "a clear and unambiguous expression of intent to transfer an interest in the property," independent of extrinsic evidence. (*Bibb*, at p. 468.) The writing must contain "language which expressly states that the

_____

[6] Sections 851, 852, and 853 set forth requirements and rules related to the transmutation of the characterization of property. For example, section 851 provides that "[a] transmutation is subject to the laws governing fraudulent transfers." Section 852 provides, in relevant part, that "[a] transmutation of real or personal property is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected," and that "[a] transmutation of real property is not effective as to third parties without notice thereof unless recorded." (§ 852, subds. (a), (b).) Section 853 provides that "[a] statement in a will of the character of property is not admissible as evidence of a transmutation of the property in a proceeding commenced before the death of the person who made the will," "[a] waiver of a right to a joint and survivor annuity or survivor's benefits under the federal Retirement Equity Act of 1984 (Public Law 98-397) is not a transmutation of the community property rights of the person executing the waiver," and "[a] written joinder or written consent to a nonprobate transfer of community property on death that satisfies Section 852 is a transmutation and is governed by the law applicable to transmutations and not by [certain provisions] of the Probate Code." (§ 853, subds. (a), (b) & (c).)

characterization or ownership of the property is being changed." (*Estate of MacDonald* (1990) 51 Cal.3d 262, 272.)

Beyond the requirements of section 852, a transmutation of property between spouses must also comport with special rules pertaining to persons occupying a confidential relationship with one another. "[S]ection 721, subdivision (b) provides in part that 'in transactions between themselves, a husband and wife are subject to the general rules governing fiduciary relationships which control the actions of persons occupying confidential relations with each other. This confidential relationship imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other.' In view of this fiduciary relationship, '[w]hen an interspousal transaction advantages one spouse, "[t]he law, from considerations of public policy, presumes such transactions to have been induced by undue influence." ' [Citation.]" (*In re Marriage of Kieturakis* (2006) 138 Cal.App.4th 56, 84.)

" 'The influence which the law presumes to have been exercised by one spouse over the other is not an influence caused by any act of persuasion or importunity, but is that influence which is superinduced by the relation between them, and generated in the mind of the one by the confiding trust which he has in the devotion and fidelity of the other. . . .' [Citations.]" (*In re Marriage of Starr* (2010) 189 Cal.App.4th 277, 285.) The presumption of inducement by undue influence under section 721, subdivision (b), "is regularly applied in marital transactions in which one spouse has deeded property to the other . . . . In such cases, it is evident one spouse has obtained an advantage—the deeded property—from the other." (*In re Marriage of Burkle* (2006) 139 Cal.App.4th 712, 730 (*Burkle*).) Thus, "the broad question whether a valid transmutation of property has taken place

10

depends not only on compliance with the provisions of section 852 but also upon compliance with rules governing fiduciary relationships." (*In re Marriage of Barneson* (1999) 69 Cal.App.4th 583, 588–589 (*Barneso*n).)

"The trial court's findings on the characterization and valuation of assets in a dissolution proceeding are factual determinations which are reviewed for substantial evidence.  [Citation.]" (*In re Marriage of Campi* (2013) 212 Cal.App.4th 1565, 1572; see also *In re Marriage of Klug* (2005) 130 Cal.App.4th 1389, 1398 [trial court's determination that property is separate or community in character will be upheld on appeal if supported by sufficient evidence].)  " '[T]he [trial] court has broad discretion to determine the manner in which community property is divided and the responsibility to fix the value of assets and liabilities in order to accomplish an equal division.  [Citations.]' " (*Campi, supra*, at p. 1572.)  "However, when the resolution of the issue ' "requires a critical consideration, in a factual context, of legal principles and their underlying values," ' the issue is a mixed question of law and fact in which legal issues predominate, and de novo review applies." (*In re Marriage of Ruiz* (2011) 194 Cal.App.4th 348, 356, fn. 3.)

" 'When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.' [Citations.]" (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881, italics omitted.)  "In a substantial evidence challenge to a judgment, the appellate court will 'consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings].  [Citations.]' [Citation.]  We may not reweigh the evidence and are bound by the trial court's credibility

11

determinations.  [Citations.]  Moreover, findings of fact are liberally construed to support the judgment.  [Citation.]"  (*Estate of Young* (2008) 160 Cal.App.4th 62, 76.)  We give deference to the trial court's factual findings "because those courts generally are in a better position to evaluate and weigh the evidence.  [Citation.]"  (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 385.)

Although an appellate court would review de novo a trial court's determination as to whether a particular writing satisfies the requirements of section 852, subdivision (a) (*Barneson*, *supra*, 69 Cal.App.4th at p. 587), the issue of the existence of undue influence is a question of fact, and a finding that the presumption has or has not been overcome will not be reversed on appeal if supported by substantial evidence.  (*Burkle*, *supra*, 139 Cal.App.4th at p. 737.)

2.  *Analysis*

At least two of Aguilar's arguments as to why the trial court should not have determined that the Rocking Horse property is Tascher's separate property involve the question whether there was undue influence involved in the transfer of that property from Aguilar to Tascher.  Specifically, Aguilar argues that (1) the trial court erred in finding that the presumption of undue influence in the intraspousal transfer had been overcome, because a domestic violence restraining order was in place against Tascher at the time the May 2015 deed of trust was signed and the court was wrong to rely on the fact that Aguilar drove to sign the deeds as evidence to overcome that presumption, and (2) the trial court failed to give adequate weight to the evidence regarding "the documented history of domestic violence perpetrated against" Aguilar by Tascher, and this failure caused the court to improperly conclude that there was no undue influence involved in the transfer.  Our

12

review of the record reveals that there is substantial evidence to support the trial court's findings with respect to the characterization of the Rocking Horse property as Tascher's separate property, and, in particular, the court's conclusion that any presumption of undue influence was overcome.

Aguilar does not challenge that there is "a writing that satisfies the statute of frauds" that includes "an expression of intent to transfer a property interest" (*Bibb*, *supra*, 87 Cal.App.4th at p. 468), given that there exist two deeds, both of which document Aguilar's intent to transfer the Rocking Horse property to Tascher as her separate property. Rather, Aguilar appears to contend that Tascher failed to present sufficient evidence to rebut the presumption of undue influence established by Family Code section 721, particularly in light of the evidence of the existence of a domestic violence restraining order against Tascher.

However, it is clear that the trial court specifically determined that Tascher overcame the presumption of undue influence that arose from Aguilar's transfer of his interest in the Rocking Horse property to Tascher, as her separate property, even with full knowledge and consideration of the domestic violence restraining order and the allegations of abuse. Our review of the record demonstrates that there is abundant evidence from which the trial court could conclude that any presumption of undue influence had been overcome. For example, Aguilar signed not one, but two separate deeds transferring the residence to Tascher as her separate property, years apart. The first was executed in 2013, prior to the issuance of any domestic violence restraining order, and the second was executed in 2015. Both deeds clearly indicate Aguilar's intention to transfer his separate property interest in the Rocking Horse property to Tascher, as her separate property. Moreover, the evidence demonstrated that Aguilar voluntarily drove himself to the locations

13

where the documents were executed—i.e., to a third-party notary's office for the first deed, and to Tascher's residence for the second, where they met with a second notary to have that deed notarized. It was significant to the trial court that Aguilar drove himself to the location where each grant deed was signed. Based on these facts, the trial court implicitly concluded that Aguilar decided, of his own free will, to travel to effectuate the property transfer, not just once, but twice. This conduct undermines the possibility that Aguilar was unduly influenced to complete the transfer through fear of further domestic violence.

Further, there was testimony directly supporting the conclusion that Aguilar transferred the property to Tascher freely and without undue influence. Tascher testified that Aguilar told her that he was transferring the Rocking Horse property to her, and that he did not appear to be under any "stress or duress" in making this decision. Another witness testified that Aguilar separately told the witness that it was his intention to give the Rocking Horse property to Tascher. The trial court clearly chose to credit the testimony of these witnesses, and found Aguilar's testimony regarding the transfer of the Rocking Horse property to be lacking credibility. Specifically, the court rejected Aguilar's testimony that he did not understand the documents, that he was "duped," or that he was unduly influenced. The trial court noted that Aguilar had "clearly lied" when he testified that he did not know the notary who had notarized the 2013 deed. The court also noted that Aguilar testified that he had filed a fraudulent federal income tax return, calling into question his overall credibility. Further, even though Aguilar's tax return had, by his own admission, included fraudulent information because, he explained, he " 'needed the money,' " he nevertheless reported on that tax return, seemingly accurately and in line with both deeds, that he

14

had transferred title to the Rocking Horse property to Tascher, undermining his assertion at trial that he did not understand the documents or that he had been "duped" into signing them. Beyond this, Aguilar claimed at trial that he did not understand English, apparently in an attempt to bolster his contention that he did not fully understand what the deeds were when he signed them, but he provided some of his testimony in English, and conceded that he had taken and passed carpentry examinations that were conducted in English. The trial court thus clearly had reason to question Aguilar's credibility and we do not second-guess a trial court's assessment of a witness's credibility. (See, e.g., *People v. Smith* (2005) 37 Cal.4th 733, 738–739 [" ' " . . . it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends" ' "].)

Further, Aguilar's own testimony was itself contradictory; he seemed to concede the absence of undue influence in his decision to execute at least one of the deeds. For example, although Aguilar had claimed that he was confused about the meaning of the deeds, or that he had been duped into signing them or that he signed the deeds only as a result of undue influence, at one point during trial, Aguilar admitted that he "freely and voluntarily drove to [Tascher's] home in Heber on May 8, 2015 to sign the Grant Deed" after Tascher had called him and asked him to sign a second deed. He even admitted that he signed the second deed because he simply wanted " 'it to be over.' " This conduct suggests that Aguilar was not unduly influenced to transfer the property to Tascher.

To the extent that Aguilar contends that the trial court failed to properly weigh the evidence of domestic violence in considering the issue of undue influence, we reject this contention. Again, our role on appeal is not to

reconsider and reweigh the evidence, but rather, simply to determine whether there is sufficient evidence to support the trial court's findings. (*Cowan v. Krayzman* (2011) 196 Cal.App.4th 907, 915 [" '[W]e do not reweigh evidence or reassess the credibility of witnesses' "].) It is clear that the trial court considered the allegations of domestic violence and weighed the evidence regarding those allegations in making its findings and reaching its conclusions. In the Statement of Decision, the trial court specifically addressed the fact that the marriage between Aguilar and Tascher had been "marked by allegations of domestic violence by each party," and also involved periods of estrangement. Further, with respect to the domestic violence restraining order, in particular, the trial court found that both parties appeared to have "largely ignored" it. The evidence in the record supports this finding. As the trial court noted, even though a domestic violence restraining order had been put in place in February 2015, Aguilar continued to go to Tascher's residence and interact with her, and he continued to have his mail delivered to him at that residence. This indicated that Aguilar was not relying on the restraining order and instead, that he continued to voluntarily interact with Tascher, perhaps even on a daily basis. Based on this evidence, the trial court could have reasonably concluded that Aguilar was not in fear of further domestic violence from Tascher. The evidence is thus sufficient to support the trial court's findings with respect to the claims of domestic violence, as well as the court's determination that the existence of the domestic violence restraining order was insufficient to overcome the

court's conclusion that any presumption of undue influence in the transmutation of the Rocking Horse property had been overcome.[7]

Aguilar also cursorily asserts what appears to be a purely legal argument, contending that the May 2015 deed of trust is "void as illegal" because "it was executed in violation of a restraining order issued by the trial court." This assertion is not supported by citations to legal authority or by reasoned legal argument. "To demonstrate error, appellant must present

---

[7] Aguilar filed a Request for Judicial Notice in this court, seeking judicial notice of 16 documents that were filed in the domestic violence restraining order proceeding in which Aguilar sought and obtained a restraining order against Tascher in 2015. Aguilar contends that this court may take judicial notice of the documents because they are court records. (See Evid. Code, §459, subd. (a) ["The reviewing court may take judicial notice of any matter specified in Section 452"] and § 452, subd. (d) [trial courts may take judicial notice of the "[r]ecords of (1) any court of this state . . . "].) Although this court *may* take judicial notice of the records of any court of this state, it is clear that the purpose for which Aguilar is seeking to have this court take judicial notice of these records is to have this court consider those documents as new evidence, together with the evidence on which the trial court relied, presumably to counter some of that evidence and support his argument for reversal of the judgment. The taking of new evidence by a reviewing court is done pursuant to a motion in the reviewing court (see Cal. Rules of Court, rule 8.252, subd. (c)(1) ["A party may move that the reviewing court take evidence"].) No such motion has been filed in this matter. Further, "[t]he circumstances under which an appellate court can receive new evidence after judgment, or order the trial court to do so, are very rare. For [an appellate] court to take new evidence pursuant to statute (Code Civ. Proc., § 909) and court rule [Cal. Rules of Court, rule. 8.252, subd. (c)(1)], the evidence normally must enable the Court of Appeal to affirm the judgment, not lead to a reversal. [Citations.] The power to take evidence in the Court of Appeal is never used where there is conflicting evidence in the record and substantial evidence supports the trial court's findings." (*Philippine Export & Foreign Loan Guarantee Corp. v. Chuidian* (1990) 218 Cal.App.3d 1058, 1090.) As noted in the text of this opinion, the record contains conflicting evidence, and we have concluded that the trial court's findings are supported by substantial evidence. We therefore deny Aguilar request for judicial notice.

17

meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error. [Citations.] When a point is asserted without argument and authority for the proposition, 'it is deemed to be without foundation and requires no discussion by the reviewing court.' " (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.) An appellant's "burden requires more than a mere assertion that the judgment is wrong. 'Issues do not have a life of their own: If they are not raised or supported by argument or citation to authority, [they are] . . . waived.' [Citation.] It is not our place to construct theories or arguments to undermine the judgment and defeat the presumption of correctness. When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.) Given the lack of any reasoned argument or citations to authority offered with respect to this assertion, we conclude that Aguilar's contention that the May 2015 deed of trust is "void as illegal" has been forfeited.

B. *Aguilar has forfeited his contentions that the trial court erred in setting the spousal support award and in dividing the parties' assets, but even on the merits, such contentions would fail*

Aguilar sets forth two separate argument headings with virtually no reasoned legal argument supporting them. His brief on appeal contains an argument heading titled, "The Judgment Granting Attorney Fees to Tascher Did Not Consider the Domestic Violence Issue, Over-Stated [Aguilar's] Income, and Does Not Make Sense in Light of Tascher's Testimony That She Paid All the Bills Herself Since 2013." (Some capitalization omitted.) Another argument heading is titled, "The Judgment Disregarding Tools of the Trade, the Food Truck, Silverado Cannot Be Upheld as It Contradicts Evidence Te[st]ified at Trial [*sic*] and Does Not Make Sense in Light of

18

Tascher's Testimony That She Paid All the Bills Herself Since 2013." (Some capitalization omitted.)[8] We conclude that the failure to provide sufficient legal argument on these points constitutes forfeiture of these contentions on appeal. However, our independent review of these matters further convinces us that Aguilar could make no showing that reversal is required with respect to either contention, even if he had not forfeited them.

1. *Aguilar provides no basis for reversing the trial court's award of spousal support*

Although the second argument heading in Aguilar's opening brief refers to the granting of "Attorney Fees" (some capitalization omitted), the body of the argument makes clear that Aguilar is not challenging an award of *attorney fees* to Tascher, but rather, an award of *spousal support* to her. This portion of Aguilar's brief, consisting of less than a page of argument, is cursory and without reasoned argument or explanation as to how the legal authority cited applies to the facts of this case. Specifically, citing Family Code section 4320, subdivision (i), Aguilar asserts that the "court should have considered the history of domestic violence documented in this case."[9] After making this assertion, Aguilar offers no other argument with respect to this issue. Instead, Aguilar merely includes two quotations from case law

---

[8] Despite the assertions in these argument headings, in the text under these headings, Aguilar appears to raise the question whether the trial court properly addressed and considered the existence of domestic violence in this case when it made determinations with respect to spousal support and the division of assets, respectively.

[9] Subdivision (i) of Family Code section 4320 provides that a trial court "shall consider," among the other items identified in separate subdivisions, "[a]ll documented evidence of any history of domestic violence, as defined in Section 6211, between the parties or perpetrated by either party against either party's child . . . ."

regarding basic principles to be applied in the setting of spousal support; he offers no application of these principles to the facts of this case. An appellant's brief must, among other things, cite to the record for factual assertions and support each contention with reasoned legal argument. (Cal. Rules of Court, rule 8.204(a)(1)(B)–(C), (a)(2)(C); C*ity of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239.) An appellate court is "not bound to develop appellants' arguments for them," and therefore, may treat an issue as forfeited when the appellant fails to support his or her argument with the necessary citations to the record, cogent legal argument, or citation to relevant legal authority. (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830.) Given the lack of cogent legal argument on this point, we conclude that Aguilar has forfeited this contention.

Further, it does not appear that Aguilar raised the issue of whether the trial court properly weighed the domestic violence allegations in setting spousal support in the trial court. Generally, the failure to raise an issue in the trial court forfeits that issue for appellate review. (*People v. Saunders* (1993) 5 Cal.4th 580, 589.) It is clear that the trial court should be provided an opportunity to consider and address an issue that would subject its order or judgment to attack on appeal. (*Kashmiri v. Regents of University of California* (2007) 156 Cal.App.4th 809, 830.) For this reason, as well, Aguilar's contention has been forfeited.

However, even on the merits this contention fails. The record demonstrates that the trial court in this case was aware of, and did consider, the existence of the domestic violence restraining order issued against Tascher and nevertheless determined that an award of spousal support was appropriate. To the extent that Aguilar is suggesting that the trial court should have weighed the evidence differently with respect to his income and

20

Tascher's ability to pay her bills, we reiterate that it is not our role to reweigh evidence to reach a result that differs from that of the trial court. (See, e.g., *Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478–479 [in performing appellate review, appellate court does not reweigh the evidence, redetermine questions of credibility, or substitute the appellate court's judgment for that of the trial court].)

2. *Aguilar provides no basis for reversing the trial court's division of the parties' assets*

In his third argument heading, Aguilar asserts that the trial court's determination regarding the division of the parties' assets "cannot be upheld as it contradicts evidence te[st]ified at trial [*sic*] and does not make sense in light of Tascher's testimony that she paid all the bills herself since 2013." (Some capitalization omitted.) We conclude that Aguilar has forfeited this contention on appeal.

The argument provided in Aguilar's briefing with respect to this point is even more cursory than that regarding spousal support, and includes only a number of assertions as to how the trial court made "erroneous" assessments of the credibility of Aguilar's testimony, as well as the contention that the court "did not consider any domestic violence." There is, essentially, no cogent legal argument on this point. Further, the record does not demonstrate that Aguilar raised these challenges to the trial court's understanding of the evidence or the court's purported failure to fairly consider domestic violence in Aguilar and Tascher's relationship. Given the lack of cogent legal argument on this point, and Aguilar's failure to raise these issues in the trial court, we conclude that this contention has been forfeited.

Moreover, although Aguilar's argument heading suggests that he is challenging the sufficiency of the evidence to support the trial court's findings

21

with respect to certain of the parties' assets, in his discussion, Aguilar argues that the only way that "a $25,000.00 food truck would be sold for $3,000.00 without husband's permission" and "a Lincoln Navigator and a Silverado truck be given without husband's permission" is "if husband is abused." As we have already explained, the trial court considered the issue of the domestic violence restraining order, and the issue of the alleged domestic violence between the parties, generally. The trial court was entitled to assess the credibility of the witnesses, to decide what inferences to draw from the evidence presented and to make factual findings based on that evidence.[10] Thus, even if Aguilar had not forfeited his contention that the trial court erred with respect to the division of the parties' assets, to the extent that Aguilar's contention on appeal can be ascertained, it fails on its merits.

IV.

DISPOSITION

The judgment is affirmed. Tascher is entitled to costs on appeal.


AARON, J.


WE CONCUR:

HALLER, Acting P. J.

DATO, J.

---

[10] For example, Aguilar argues on appeal that the trial court erroneously concluded that Aguilar "filed fraudulent tax returns," a conclusion that, on appeal, Aguilar asserts is not true. However, according to the Settled Statement, Aguilar admitted that his 2016 tax return "was fraudulent, that he lied on the return because[ ] '[he] needed the money.' "

22